Froessel, J.
The real question presented on this appeal is whether a witness before the State Commission of Investigation, who answers questions enumerated in a warrant of commitment procured by the commission, may be incarcerated indefinitely until he consents to give a character of testimony which in the opinion of the commission and the courts is not perjured.
Relators, along with others, were subpoenaed to testify before the Commission of Investigation of the State of New York at public hearings, which commenced during August of 1958, concerning the so-called Apalachin ‘ ‘ meeting ’ ’ held at the home of Joseph Barbara, Sr., in Apalachin, Tioga County, New York. Relators appeared before the commission and claimed their privilege against self incrimination as to all questions asked other than those directed merely to identifying data. After the commission granted relators complete immunity from prosecution by New York State authorities, they persisted in their refusal to testify and were committed to civil jail, pursuant to subdivision 3 of section 406 of the Civil Practice Act. That statute provides, in pertinent part, that if a person duly subpoenaed to appear before certain officials and nonjudicial bodies specified in subdivision 1 “ refuses without reasonable cause * * * to answer a legal and pertinent question ”, he may, by order and warrant of the court, be committed to jail “ there to remain until he submits to do the act which he was so required to do ”.
The orders and warrants committing relators specified 26 questions which relators had refused to answer. This was in *394 accordance with subdivision 4 of section 406, which provides that ‘ ‘ if the witness is committed for refusing to answer a question, the question must be inserted in the warrant ”. The 26 questions were designed to elicit the witnesses’ knowledge of Barbara, the circumstances under which they attended the alleged “ meeting ”, what happened there, and any prior relationship among those who attended. The Appellate Division unanimously affirmed the commitment of relators, along with five other recalcitrant witnesses (Matter of Commission of Investigation v. Lombardozzi, 7 A D 2d 48), and we unanimously affirmed (5 N Y 2d 1026).
Six days after this court’s order of affirmance was handed down, the commission convened a hearing, at the request of relators, to give them an opportunity to answer the enumerated questions and obtain their release. Over the repeated objections of counsel, questions far afield of the 26 enumerated in the orders and warrants of commitment were asked; but during the course of the interrogation the 26 specific questions were asked of each witness. The commission concedes that both relators gave “some sort of answer to each question”, but contends that the answers given were “ in varying degrqes, false, evasive, and obstructive of its investigation; indeed, in many instances the answers are inherently incredible ”.
The evidence given by relators in answer to the 26 and directly related questions was virtually the same. On November 13, 1957, Costenze, who was suffering from lead poisoning and not feeling well, decided while at Rochester to take a pleasure and rest trip to New York City for a few days, and asked Frank to join him. Frank agreed to accompany him if they would later go on to Pittsburgh, where Frank was arranging the sale of his house. He had recently moved from Pittsburgh to Rochester, where Costenze resided, but had not yet disposed of his Pittsburgh home. Costenze agreed to the Pittsburgh trip, and on their way to New York they stopped at Syracuse to visit a friend named Sam Scro. They spent the night of the 13th in a motel on the outskirts of Syracuse.
The following morning, during breakfast, Costenze suggested that before proceeding to New York they drive to Apalachin to visit a friend who was ill. Frank had never before met this friend, one Barbara, but, without eliciting or obtaining any *395 additional information, agreed to the detour since he had no definite appointment in Pittsburgh and his brother was killing “ three or four days anyway”. Costenze had met Barbara some 5 to 7 years previously at a beer convention in Rochester, and had met him some 3 or 4 times since — once at a wedding, though he did not recall the details, and once at Barbara’s Apalachin home, when he also dropped in unannounced to inquire after Barbara’s health. During the years he had known Barbara they never corresponded, spoke on the telephone, or had any business dealings, and Barbara had never visited Costenze at the latter’s home. As to his knowledge of Barbara’s illness, Costenze testified that when he had first met Barbara at the convention Barbara told him that he was not feeling well and had lost a tremendous amount of weight. He subsequently learned that Barbara was about to undergo a heart operation, but he could not recall when or where he had learned this.
When they arrived at Barbara’s home, they were both surprised to see such a large gathering there, which they estimated to be anywhere from 25 to 70 people. Frank testified: “I didn’t go over there and visit a guy and go over and count how many people there was there. I don’t know how many was there. There could have been 30, 20, 40; I don’t know. Three or four guys here with a sandwich, drinking; four or five guys at one end of the yard and at the other end of the yard ”, and then in answer to question 14, which called for the approximate number of persons present, stated: “To the best of my knowledge, I’d say I saw about 30 or 40 or 50 people, tops.” Costenze testified that he “honestly and truthfully” did not remember how many people were there, as he did not count them, but later, in specific answer to question 14, answered: ‘ ‘ Approximately 30, 25. ’ ’
When they arrived on the premises they proceeded directly to the house and met their host in the living room. Costenze introduced Frank to Barbara, and Frank said he “was glad to meet him and that was it. To me he was a stranger ”. Costenze inquired after Barbara’s health; Barbara said he “wasn’t feeling like he should and that he had to take it easy ’ ’, and 5 or 10 minutes of casual conversation ensued, “ All pertaining to his, more or less, you’d say, medical report ”. Barbara then invited them to partake of food and drink, which was *396 available in the yard on a self-service basis, and to ‘ ‘ walk around, make yourself right at home”. Neither Frank nor Oostenze saw Barbara again until they said their goodbyes some 6 hours later.
Both Frank and Oostenze testified that they met a number of friends and acquaintances on the premises, whom they identified by name, and their conversation was only casual. There were no public officials present, to their knowledge, and neither had had any business dealings with any of the persons present. Frank testified that he did not ask Barbara or any of the other persons he met why they had come, or what the occasion for such a large gathering was, as it was not his home and he did not think it was any of his business. Oostenze testified likewise, except as to a conversation he had with a friend named Jimmy La Duca, whom he met on the premises. He had no discussion with La Duca as to why so many people were there, since “ That wasn’t my home. I don’t think it was up to me to ask anything. I went to see a sick friend and I don’t see where it’s any of my business to go around asking people 1 What are you doing here? ’ It’s not my house.”
During the 6 hours they were there they wandered around admiring the premises and the surrounding countryside, sat down on chairs in the yard, and partook of the refreshments. They did not return to the house, and both repeatedly testified that there was no “ meeting ” and that no one addressed the gathering. Frank testified that Oostenze ‘ ‘ was with me, practically all the time ’ ’, and Oostenze testified likewise. They left at about 6:00 p.m., and, according to Oostenze, Barbara “ didn’t say nothing outside of goodbye. He was glad to see me. I was glad to see him. I told him to take care of himself and to do what the doctor tells him to do, and that was it.”
Upon leaving the premises they were stopped by the State Police and taken to the State Police Barracks at Vestal, where they were stripped, frisked and questioned. After they were released, they decided to curtail their trip and return to Rochester. Frank testified that he ‘ ‘ was disgusted with the whole thing” and decided to make his Pittsburgh trip alone at a later date. Oostenze testified that he “ didn’t know why I was stopped or why I was frisked, or any of this, why it *397 went on ” and “ thought it would be best to go home and stay with my wife ”, who was expecting a child.
At the conclusion of Frank’s questioning, counsel sought the consent of the commission to his release on the ground that he had complied with the order and warrant committing him. The chairman refused to give such consent on the ground that Frank’s testimony was “unworthy of belief”, “inherently incredible ’ ’ and 14 calculated to impede and thwart the efforts of the Commission in this investigation ’ ’. His basis for so concluding was that “it is incredible to us that if the answers given here are the truth why those answers could not have been given way back last August, when he was first asked about it, and why he had to resort to the privilege against self-incrimination, and, why, from his own standpoint, he found it necessary to serve seven months in prison before coming here and giving us this kind of a story.” The chairman adjourned the hearing as to Frank ‘ ‘ until such time as he is prepared to come in here and tell us the truth ”.
Although counsel took vigorous exception to the chairman’s remarks with reference to the assertion of the privilege, the chairman later interrogated Costenze at length as to his reason for invoking the privilege against self incrimination. At the conclusion of Costenze’s testimony, the chairman stated that he believed his answers to be untrue and advised Costenze, as he had Frank, ‘ ‘ that at any time that you are prepared to come forward and tell us the truth the Commission will be ready to hear you”.
The narrow issue before us, as framed by Special Term, is ‘6 whether the questions have or have not been answered within the purview of the statute ”. In passing on that issue, it is important to note that relators’ prior invocation of the privilege against self incrimination may not be used as a basis for concluding that they have evaded their obligation to answer. In People ex rel. Falk v. Sheriff (258 N. Y. 437, 439-440), the only case in which this court considered the precise issue now before us, we pointed out that the purpose of a commitment pursuant to subdivision 3 of section 406 of the Civil Practice Act is “to enforce the duty to answer a pertinent inquiry by keeping the witness in jail till the answer has been supplied *398 * * * When once that is done, he is entitled to his discharge, though there was evasion or deceit in setting up the claim of privilege whereby an answer was delayed. * * * Whatever contempt may have been involved in his deceitful claim of privilege must have redress in some other proceeding and not improbably in another forum ”. (Emphasis supplied.) (See, also, Slochower v. Board of Educ., 350 U. S. 551, 557.)
It is well-settled law in this State, as recognized in principle by both courts below, that false testimony is not punishable summarily as a civil contempt (Fromme v. Gray, 148 N. Y. 695; Matter of Foster v. Hastings, 263 N. Y. 311; Matter of Silberman Dairy Co. v. Econopouly, 177 App. Div. 97), or as a criminal contempt (Matter of Finkel v. McCook, 247 App. Div. 57, affd. 271 N. Y. 636; People v. De Feo, 284 App. Div. 622, revd. on another ground 308 N. Y. 595; Matter of Steingut v. Imrie, 270 App. Div. 34). In the Foster case we unanimously rejected the argument that “false swearing is not to be distinguished from a refusal to testify ”, and held "that on the issue of perjury the witness who is alleged to have testified falsely “ is entitled to a trial by jury under the safeguards of the criminal law ” (263 N. Y., p. 314; see, also, Matter of Finkel v. McCook, 247 App. Div., pp. 64-65, affd. 271 N. Y. 636, supra).
With respect to both civil and criminal contempt, however, the courts of this State have recognized that under certain circumstances a response to a question may be so false and evasive as to be equivalent to no answer at all. Thus in the Foster case we noted that “ when it plainly appears that the witness denies knowledge or recollection of a fact, obviously to evade an answer as to matters within his recollection, the court may refuse to aid in a mere subterfuge and may compel an answer ’ ’ (263 N. Y., supra, p. 314; emphasis supplied), and in the Finkel case the Appellate Division wrote: “ There is a distinction between the untruthful statement which does not clearly appear to be such from the face of the record but is uncovered only with the aid of extrinsic evidence and testimony which is so plainly inconsistent, so manifestly contradictory and so conspicuously unbelievable as to make it apparent from the face of the record itself that the -witness has deliberately concealed the truth and has given answers which are replies in form only and which, *399 in substance, are as useless as a complete refusal to answer. This distinction was considered by the Supreme Court of the United States in Ex parte Hudgings (249 U. S. 378).” (247 App. Div., supra, p. 63; emphasis supplied.) (See, also, People v. De Feo, supra, pp. 624-626.)
We think we may safely assume, as did the Appellate Division, that “ the rules developed in relation to the distinction between the merely false answer and the evasive one in the field of judicial contempt are wholly applicable to proceedings arising under section 406.” (In this connection, note the cases cited by this court in the Falk case, 258 N. Y., supra, p. 439; see, also, Matter of Barnes, 204 N. Y. 108, 122.) This would certainly seem so as regards civil contempt under sections 753 (subd. 5) and 774 of the Judiciary Law, pursuant to which a person who refuses to answer after being subpoenaed as a witness may be imprisoned until he performs the act which it is in his power to perform (see Stewart v. Smith, 186 App. Div. 755; Ditomasso v. Loverro, 242 App. Div. 190, 193-194). The function of both a civil contempt and a section 406, subdivision 3, commitment is remedial and coercive, and the recalcitrant witness holds the key to his freedom. We think that it is likewise so as to criminal contempt under subdivision 5 of section 750 of the Judiciary Law, pursuant to which a witness may be summarily punished for a “ Contumacious and unlawful refusal * i;: * to answer any legal and proper interrogatory ’ ’, though it must be remembered that the maximum term of imprisonment for a summary criminal contempt, under any circumstances, is 60 days (Judiciary Law, § 751; see Ex parte Hudgings, 249 U. S. 378, 384).
The problem is to give meaningful content to the distinction between the false answer and the answer that is so false and evasive as to be tantamount to no answer at all. The example given in the Foster case (supra, p. 314) was the witness who “ denies knowledge or recollection of a fact, obviously to evade an answer as to matters within his recollection ”. In a similar vein, the court in the He Feo case noted (284 App. Div., supra, pp. 624-625): “ Consistent lack of memory or recollection of all transactions for a recently passed period relating to large and significant expenditures covering a principal activity of a *400 business is not understandable, except as a deliberate and contemptuous evasion of the questions put.” (Emphasis supplied.)
In United States v. Appel, probably the most oft-cited case on the subject, Judge Hand noted (211 F. 495-496): “ it could not be enough for a witness to say that he did not remember where he had slept the night before, if he was sane and sober, or that he could not tell whether he had been married more than a week.” (Emphasis supplied.) The witness in that case had been questioned as to his disposition of certain funds, and, in holding (p. 497) that his story as to alleged gambling losses was “ obviously a mere sham ”, Judge Hand emphasized (p. 496) his inability 1 ‘ to give the names of any places but one of these where he had lost any such sum as he stated, and his entire vagueness about matters which were so recent, and which must have impressed themselves upon his memory at the time to a greater extent.”
In the Finkel case (and see, also, Matter of Kamell, 170 Misc. 868, affd. 258 App. Div. 723, which involved very similar facts and the same issue), one of the subjects of a Grand Jury investigation was racketeering in the restaurant and cafeteria business, and of particular concern was an association, ostensibly made up of restaurant and cafeteria owners, the persons in control of which were suspected of extortion in combination with certain labor union officials. Finkel, who was an officer and principal stockholder of a restaurant corporation, was called as a witness and his examination centered around six payments made by him—as shown on the books of the corporation; the persons to whom payments were made and the dates thereof; the circumstances surrounding the payments; and any connection they may have had with his joining the association.
In holding that the witness’s answers to these questions were equivalent to a “ Contumacious and unlawful refusal * * * to answer ”, i.e., a summary criminal contempt under subdivision 5 of section 750 of the Judiciary Law, the Appellate Division noted (p. 60) that his testimony “‘was of such a nature as to permit contradiction by documentary proof ’ ” and (p. 62) by “ his own admission he [was] chargeable with perjury As to one expenditure, Finkel “ offered three distinct explanations” (p. 61) and, as to another, he “gave many *401 different explanations ”, The “ contradictions and changes in his testimony ” and “his denials of the evidence set forth in his own records ” led the court to conclude (p. 65) that his answers were “ answers in form only and were clearly tantamount to a refusal to answer
In the leading case of Ex parte Hudgings (249 U. S. 378, 383, supra), relied upon by the Appellate Division in the Finkel case, and cited by us in Falk, the Supreme Court held: “ in order to punish perjury in the presence of the court as a contempt there must be added to the essential elements of perjury under the general law the further element of obstruction to the court in the performance of its duty. As illustrative of this, see United States v. Appel, 211 Fed. Rep. 495.” (See, also, United States v. McGovern, 60 F. 2d 880; Blim v. United States, 68 F. 2d 484.)
The court then warned of the danger of “ mistakenly attribut[ing] a necessarily inherent obstructive effect to false swearing ”, since “it would follow that when a court entertained the opinion that a witness was testifying untruthfully the power would result to impose a punishment for contempt with the object or purpose of exacting from the witness a character of testimony which the court would deem to be truthful; and thus it would come to pass that a potentiality of oppression and wrong would result and the freedom of the citizen when called as a witness in a court would be gravely imperiled.” (p. 384; emphasis supplied.)
It is significant to note that in Hudgings the order of commitment “ directed that it should continue in force until the petitioner had purged himself of the contempt for which he was being punished ” (p. 382). In holding that “ the punishment was imposed for the supposed perjury alone without reference to any circumstance or condition giving to it an obstructive effect ” and hence was unlawful, the Supreme Court (p. 384) noted that “when the provision of the commitment directing that the punishment should continue to be enforced until the contempt, that is, the perjury, was purged, the impression necessarily arises that it was assumed that the power existed to hold the witness in confinement under the punishment until he consented to give a character of testimony which in the opinion of the court would not be perjured.” (Emphasis supplied.)
*402 Finally, in Matter of Michael (326 U. S. 224) the witness had been adjudged in criminal contempt and sentenced to six months ’ imprisonment “ on findings that he had given ‘ false and evasive ’ testimony before a Grand Jury which ‘ obstructed the said Grand Jury in its inquiry and the due administration of justice ’ ’ ’ (p. 225). The Supreme Court granted certiorari “ in view of the close similarity of the issues here to those decided in Ex parte Hudgings, 249 U. S. 378 ” (p. 225), and, in defining the necessary element of obstruction, said (pp. 227-228): “ All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. Therefore it cannot be denied that it tends to defeat the sole ultimate objective of a trial. It need not necessarily, however, obstruct or halt the judicial process. For the function of trial is to sift the truth from a mass of contradictory evidence, and to do so the fact-finding tribunal must hear both truthful and false witnesses. It is in this sense, doubtless, that this Court spoke when it decided that perjury alone does not constitute an ‘ obstruction ’ which justifies exertion of the contempt power and that there ‘ must be added to the essential elements of perjury under the general law the further element of obstruction to the Court in the performance of its duty. ’ Ex parte Hudgings, supra, 382, 383, 384. And the Court added, ‘ the presence of that element [obstruction] must clearly be shown in every case where the power to punish for contempt is exerted. ’ ’ ’
The court reversed the conviction because “ no element except perjury ” was “ ‘ clearly shown’” (p. 228), and in so doing-provided us with the only workable test in distinguishing between the false answer and the answer that is so false and evasive as to amount to no answer at all. In this connection, the court held that “ a reading of the evidence persuades us that the Circuit Court of Appeals correctly found that [the witness] had directly responded with unequivocal answers. These unequivocal ansivers were clear enough so that if they are shown to be false petitioner would clearly be guilty of perjury.” (p. 226; emphasis supplied.) The court distinguished the Appel case (supra) on the ground that the testimony there “ was ‘ on its mere face, and without inquiry collaterally, * * * not a bona fide effort to answer the questions at all ’ ” (pp. 228-229; *403 emphasis supplied). (See, also, Nilva v. United States, 352 U. S. 385, 398; Brown v. United States, 356 U. S. 148,153.)
It must be remembered that in the Falk case this court held (258 N. Y., supra, p. 439): “We are not at liberty to say, * * * that ‘ the testimony is not a bona fide effort to answer the questions at all ’ and in the Foster case (263 N. Y., supra, p. 314) we similarly held: “ Nothing on the face of the judgment debtor’s evidence * * * suggests that it was not a bona fide effort to answer the questions.” (See, also, People v. Caidin, 238 App. Div. 813, appeal dismissed 267 N. Y. 551.)
The teaching of the Michael case (supra) is that if the witness directly responds with unequivocal answers which are clear enough to subject him to a perjury indictment, then he has made a “ bona fide effort to answer ” and may not be summarily committed for refusing to answer.
The obvious advantage of this test is that it focuses exclusively on the internal content of the witness’s answers, and avoids any need of characterizing the testimony by such nebulous and elusive standards as “ palpably false and evasive of the obligation to answer”, “ so false as to offer not the slightest probability of truthfulness ”, “ so false and preposterous as to preclude the raising of any issue of fact ’ ’, and ‘ ‘ so patently obstructive and evasive as to raise no issue of fact ’ ’. All four of the quoted standards were invoked by the Appellate Division at one point or another in its opinion, and the court itself recognized that the terminology used was “ hardly satisfactory ’ ’. The chief difficulty in applying these nebulous standards is that the mere statement of any one of them requires a further definition of just what it means, and the process of definition and redefinition can continue ad infinitum. In our opinion, the only meaningful standard by which it may be determined whether each of the relators “ submit [ted] to do the act which he was so required to do ” (Civ. Prac. Act, § 406, subd. 3) is whether he ‘ ‘ directly responded ’ ’ to the enumerated 26 questions “ with unequivocal answers * * * clear enough so that if they are shown to be false [he] would clearly be guilty of perjury ” (Matter of Michael, supra, p. 226). If they did so respond, then they have purged themselves of their refusal to answer and their perjury, if any, must be proven and punished in the criminal tribunal in accordance with the safeguards of *404 the criminal law. When the answers given by Frank and Oostenze are carefully measured against this standard, it becomes apparent that, though they may have been false, they were definite and unequivocal (see Matter of Michael, supra, p. 226, n.).
The Appellate Division’s basis for distinguishing between the answers given by relators was that ‘1 since both Frank and he had concurred that it was he who brought Frank to the meeting, he had the heavier burden to explain the happening of the event.” The aspects of Oostenze’s testimony which in its opinion distinguish his answers from Frank’s related to (1) the former’s knowledge- of Barbara’s illness; (2) his failure to find out whether his presence was an intrusion; (3) his estimate of the number of persons present at Apalachin, and (4) his failure to ask his host obvious questions. Frank’s situation was no different from Oostenze’s, except that the latter had known Barbara before. The commission as well as the relators agree that there can be no distinction between Frank and Oostenze. Both Frank and Oostenze had exactly the same burden in this proceeding, namely, to supply definite answers to 26 identical questions and thus purge their refusal to answer. To each of these questions each witness gave a definite answer and thereby subjected himself to a multi-count perjury indictment, if the answers are shown to be false. It bears constant repetition that the truth or falsity of the answers is immaterial here.
We are not unmindful of the problem of the commission in seeking to uncover the true purpose of the gathering at Apalachin. But if, as we have said, ‘ ‘ Punishment for a criminal contempt [by not more than 60 days’ imprisonment] is a drastic remedy for willful wrong” (Matter of Spector v. Allen, 281 N. Y. 251, 259; People v. De Feo, 308 N. Y. 595, 605, supra), then an indefinite incarceration for a refusal to “ answer ” questions must be sanctioned with even greater caution. A reading of this record impels us to the conclusion that relators were in effect “ sentenced ” by Special Term to imprisonment “ with the object or purpose of exacting from [them] a character of testimony which the court would deem to be truthful” (Ex parte Hudgings, supra, p. 384). If “ the power existed to hold a witness in confinement # * * until he consented to give *405 a character of testimony which in the opinion of the court would not be perjured ’ ’, then ‘ ‘ it would come to pass that a potentiality of oppression and wrong would result and the freedom of the citizen when called as a witness * * * would be gravely imperiled ” (id.).
By keeping relators in prison until they supply answers which satisfy the commission and the courts, they are not only being sentenced to conceivable life imprisonment, without a trial by jury or any of the other traditional rights which the law accords to a defendant, but they are in effect being compelled to admit they committed perjury in giving the answers they did. Such an arbitrary deprivation of liberty makes a hollow mockery of the “ due process of law ” requirement. To cull a phrase from Chief Judge Cabdozo, used in a different context but appropriate here, “ A community whose judges would be willing to give it whatever law might gratify the impulse of the moment would find in the end that it had paid too high a price (Matter of Doyle, 257 N. Y. 244, 268.)
The order of the Appellate Division respecting Frank Valenti should be affirmed, and the order of that court respecting Costenze Valenti should be reversed, and his discharge directed.
Bubke, J.
There is no discernible distinction in the degrees of falsity between the answers given by Costenze Valenti and Frank Valenti which justifies different treatment on these appeals. Alleged differences based upon the fact that one relator drove the automobile to Apalachin, N. Y., and the other relator was a passenger are slight. The answers given which are obstructive of the investigation were concerned with the six hours spent at the premises of Mr. Barbara. Both relators were confined under similar court orders until they would answer “ truthfully and responsively” the questions put to them by the Commission of Investigation. Incredible, evasive, inconsistent testimony designed to thwart the legitimate object of the inquiry does not constitute compliance with the court order, and serves no basis for the issuance of a writ of habeas corpus. (Cf. People ex rel. Falk v. Sheriff, 258 N. Y. 437; United States v. Appel, 211 F. 495.) It is no answer that relators may be subject to prosecutions for perjury, since that *406 remedy is designed solely to punish relators and will not achieve the purposes of section 406 of the Civil Practice Act, which is designed to obtain truthful answers to legitimate objects of investigation and inquiry.
Accordingly, the order of the Appellate Division affirming the dismissal of the writ of habeas corpus as to Costenze P. Valenti should be affirmed. The order of the Appellate Division granting the writ of habeas corpus to Frank J. Valenti should be reversed, and the writ dismissed.
Desmond, J.
Costenze Valenti’s answers were on their face not only false but so clearly evasive and obstructive as to amount to a refusal to answer at all and so were contemptuous and contumacious as matter of law. But, like the Appellate Division, I feel differently as to the answers of Frank Valenti. Those answers, as pointed out in the Appellate Division opinion, were sufficiently responsive so as to raise an issue of credibility only. Accordingly, I am in full agreement with the Appellate Division and vote to affirm in each case.
Upon the appeal of the People as to Frank Valenti: Order affirmed.
Judges Fuld and Van Voobhis concur with Judge Froessel ; Judge Desmond concurs for affirmance in a separate opinion.
Upon the appeal of the relator, Costenze P. Valenti: Order affirmed.
Chief Judge Conway and Judge Dye concur with Judge Burke; Judge Desmond concurs for affirmance in a separate opinion.
Orders affirmed.