UNITED STATES of America, Appellee,

v.

Russell A. BUFALINO, Ignatius Cannone, Paul C. Castellano, Joseph F. Civello, Frank A. DeSimone, Natale Evola, Louis A. Larasso, Carmine Lombardozzi, Joseph Magliocco, Frank T. Majuri, Michele Miranda, John C. Montana, John Ormento, James Osticco, Joseph Profaci, Anthony P. Riela, John T. Scalish, Angelo J. Sciandra, Simone Scozzari and Pasquale Turrigiano, Defendants-Appellants.

No. 357, Docket 26194.

United States Court of Appeals Second Circuit.

Argued June 9, 1960.

Decided Nov. 28, 1960.

Robert S. Erdahl, Dept. of Justice, Washington, D. C. (Malcolm Richard Wilkey, Asst. Atty. Gen., S. Hazard Gillespie, Jr., U. S. Atty., for the Southern District of New York, New York City, Beatrice Rosenberg, Philip R. Monahan, Washington, D. C., Michael A. Berch and John E. Sprizzo, New York City, Dept. of Justice, Washington, D. C., on the brief), for appellee.

Frederick S. Abrams, New York City, for defendant-appellant Russell A. Bufalino.

Remo A. Allio, Endicott, N. Y., for defendants-appellants Ignatius Cannone and Pasquale Turrigiano.

Osmond K. Fraenkel, New York City, for defendants-appellants Paul C. Castellano and Carmine Lombardozzi.

Percy Foreman, Houston, Tex. (David M. Markowitz, New York City, on the brief), for defendant-appellant Joseph F. Civello.

A. L. Wirin, Los Angeles, Cal. (William B. Beirne and Fred Okrand, Los Angeles, Cal., on the brief), for defendants-appellants Frank A. De Simone and Simone Scozzari.

Frederick S. Abrams, New York City, for defendant-appellant Natale Evola.

Anthony A. Calandra, Newark, N. J. (Aaron J. Jaffe, New York City, on the brief), for defendants-appellants Louis A. Larasso and Frank T. Majuri.

Edward H. Levine, New York City (Vernon C. Rossner, New York City, on the brief), for defendant-appellant Joseph Magliocco.

Abraham H. Brodsky, New York City, for·defendant-appellant Michele Miranda.

Frank G. Raichle, Buffalo, N. Y. (Maurice N. Nessen, New York City, and Raichle, Moore, Banning & Weiss, Buffalo, N. Y., on the brief), for defendant-appellant John C. Montana.

George Feit, New York City (Abraham Feit, New York City, on the brief), for defendant-appellant John Ormento.

Stanford Shmukler, Philadelphia, Pa. (Jacob Kossman, Philadelphia, Pa. on the brief), for defendants-appellants Angelo J. Sciandra and James Osticco.

Henry G. Singer, Brooklyn, N. Y. (Harry Silver, Brooklyn, N. Y., on the brief), for defendant-appellant Joseph Profaci.

Louis Mansdorf, New York City, for defendant-appellant Anthony P. Riela.

Osmond K. Fraenkel, New York City (Fred H. Mandel, Cleveland, Ohio, on the brief), for defendant-appellant John T. Scalish.

Leonard B. Boudin, David Scribner, New York City (David G. Lubell, Shirley. Fingerhood, Sidney Schreiberg, New York City, of counsel), for National Lawyers Guild, amicus curiae.

Nanette Dembitz, Melvin L. Wulf, New York City (Rowland Watts, New York City, of counsel), for American Civil Liberties Union and New York Civil Liberties Union, Amici Curiae.

Before LUMBARD, Chief Judge, and CLARK and FRIENDLY, Circuit. Judges.

LUMBARD, Chief Judge.

Russell Bufalino and nineteen co-defendants appeal from judgments of conviction in the Southern District of New York for conspiring to obstruct justice and commit perjury (18 U.S.C. §§ 371, 1503, 1621) by giving, before federal grand juries, false and evasive testimony regarding a gathering attended by them and at least 39 others at the home of Joseph Barbara, Sr., in Apalachin, New York, on November 14, 1957. Named as members of the conspiracy were seven other co-defendants and 36 co-conspirators.[1] The appellants were all sentenced to prison terms running from three to five years, and in addition thirteen of them were each fined $10,000.

The indictment, the charging part of which is set forth in the margin,[2] alleged

---

1. One defendant, Cucchiara, was acquitted by order of the court; four, Salvatore Falcone, Joseph Ida, James LaDuca, and Anthony Magaddino, were fugitives and the court severed the trials of Joseph Bonanno and John DeMarco.

As to four of the alleged conspirators named in the indictment, i. e. Nicholas Civella, Joseph Filardo, John Larocca, and Paul Scarcelli, no evidence was introduced at the trial to establish their presence in the area.

2. The indictment, in the form in which Judge Kaufman submitted it to the jury, charged:

"1. That commencing on or about the 14th day of November 1957, and continuously thereafter up until the date of filing this indictment, at the Southern District of New York * * * [the defendants and co-conspirators] did unlawfully, wilfully, and knowingly combine, conspire, confederate and agree together, and with each other and with others to the said grand jury unknown, to commit offenses against the United States,

to wit: to violate Title 18, Sections 1503 and 1621, United States Code.

2. That, further, as the said defendants and their co-conspirators well knew, a special investigation had been commenced by a United States Grand Jury in March of 1956 in the United States District Court for the Southern District of New York, and has continued before Federal Juries up until the date of the filing of this indictment.

3. During the course of said conspiracy as the said defendants and their co-conspirators well knew, a meeting of individuals, some of whom were involved in the aforesaid special investigation, was held at the home of Joseph Barbara, Sr., a co-conspirator herein, in Apalachin, New York, on or about November 14, 1957, which was attended by the defendants and their co-conspirators, among others.

4. During the course of said conspiracy, as the said defendants and their co-conspirators well knew, following the aforesaid meeting, Grand Juries of the United States, duly impaneled and sworn

a conspiracy from November 14, 1957, the date of the Apalachin gathering, to the filing of the indictment on May 13, 1959. The 29 overt acts of the indictment which the court submitted to the jury charged that pursuant to the conspiracy various conspirators made statements and gave testimony under oath at different stated places and times from November 14, 1957 to May 11, 1959, including testimony on eleven occasions before federal grand juries in the Southern District of New York.

The indictment did not allege what the November 14, 1957 gathering at Apalachin was about, and the government stated at the beginning of the trial that it could present no evidence of its purpose. There is nothing in the record of the trial to show that any violation of federal or state law took place or was planned at the gathering, although federal grand juries in the Southern and Western Districts of New York on twenty occasions over the following year and one-half, and a variety of other federal and state officials on numerous other occasions, questioned many of these present about the Apalachin gathering and the surrounding circumstances.

We find that in two essential respects the evidence was insufficient to prove the crime charged. First, we find that the government failed to introduce sufficient evidence to support a finding that the defendants *agreed* to lie about the gathering. Second, we hold that the evidence was insufficient to show that the defendants had reason on November 14, 1957, to anticipate that any of them

---

in and for the United States District Courts for the Southern District of New York and elsewhere, began conducting an investigation into all of the material circumstances concerning the aforesaid meeting, and issued subpoenas directing the said defendants and their co-conspirators to appear before the said Grand Juries and give testimony and evidence.

5. During the course of said conspiracy, it was the belief of the defendants and their co-conspirators, that the individuals who had been present at the aforesaid meeting would be questioned in connection with said investigation concerning the aforesaid meeting, with respect to its purpose, the number and identity of persons who were present, the arrangements preceding the aforesaid meeting, the conversations and other events which took place and all the other circumstances surrounding the said occasion.

6. It was a part of the said conspiracy that the defendants and their co-conspirators, by false, fictitious and evasive testimony, and by other contumacious conduct, and by the commission of perjury, would conceal from the aforesaid Grand Juries and from other investigating bodies and agencies of the United States the fact that the aforesaid meeting had taken place, the purpose and advance planning of the aforesaid meeting, the number and identity of persons who were present on said occasion, the conversations and other events which took place, and all the other material circumstances surrounding the said occasion.

7. It was a further part of said conspiracy that said defendants and their co-conspirators, having taken oaths before competent tribunals, to wit, said Grand Juries, in matters in which a law of the United States authorizes an oath to be administered, that they would testify truly, would wilfully and knowingly and contrary to said oath, state material matter which they did not believe to be true.

8. It was a further part of said conspiracy that said defendants and their co-conspirators would corruptly influence, obstruct and impede, and corruptly endeavor to influence, obstruct and impede the due administration of justice in the United States District Courts for the Southern District of New York and elsewhere, by giving false, fictitious and evasive testimony and by other contumacious conduct, and by the commission of perjury.

9. It was a further part of said conspiracy that the defendants would give and would corruptly influence the said co-conspirators and others to give false material information about the said meeting to investigating bodies, and agencies of the United States, and give false, fictitious, fraudulent, vague, evasive and manufactured material testimony under oath about the aforesaid meeting before the said Grand Juries."

[Counts II, III, and IV of the indictment, charging defendants Magliocco, Profaci, and Turrigiano with perjury before grand juries of the Southern District of New York, were severed by agreement before the start of the trial.]

would be called to testify under oath about the events of that day.

## I

The government contends that the November 14 gathering was planned in advance; that when those present became aware that law-enforcement officers had discovered the assemblage they thought there might be an investigation and immediately agreed to give false, fictitious and evasive accounts of the circumstances of the gathering to official inquiries, including formal proceedings calling for sworn testimony; and that when some were summoned before federal grand juries inquiring into the nature of the gathering, they testified falsely pursuant to the agreement. The government's claim was that "the participants gave false and evasive accounts as to the planning and purpose of the meeting and the circumstances and reasons for their presence, all of which were basically similar in that they were calculated to explain away the meeting as a mere coincidental gathering." [3]

The government's proof of the agreement consisted entirely of testimony by state and federal officers regarding unsworn statements made by the conspirators on November 14 and on numerous occasions thereafter and of excerpts from official records of sworn statements made after November 14. The defendants did not take the stand and offered no evidence to counter the government's contention that they had conspired.[4] The government's theory is that the similarity of the statements, insofar as "they all deny planning and seek to concoct a picture of accidental and coincidental presence at Barbara's," [5] and insofar as most of them explain the visits as motivated by concern for Barbara's illness, can be accounted for only if there was an agreement on November 14, 1957.

The government claimed that the conspiracy was formed between 12:40 P.M. on November 14, when Barbara's wife saw the officers' unmarked car in the driveway, and 1:20 P.M. when a mass exodus from Barbara's home began. The court charged the jury that in order to find that any defendant was a member of the conspiracy it would have to conclude that he "willingly entered" the conspiracy sometime before midnight on November 14, at which time the officers completed their questioning of the alleged conspirators at the state police barracks at Vestal.

### A. The Events on November 14

At 12:40 P.M. on November 14, Sergeant Edgar Croswell of the New York State Police, accompanied by another state trooper and two agents of the Alcohol and Tobacco Tax Unit of the U. S. Treasury Department, drove from a public road into the parking lot in front of Barbara's garage. Barbara's home was an estate of 130 acres in a rural section, and his house and garage were on a dead-end dirt road. After recording the license numbers of some of the eight or ten cars in the lot and observing several unidentified men, they drove away. Before leaving, however, Croswell noticed four or five men walking or running toward the house and saw at least 20 other cars parked away from the house. At 12:50, Croswell and his companions parked their car half a mile from Barbara's home and set up what amounted to a roadblock.

When Croswell backed out of the Barbara driveway Mrs. Barbara saw his car and exclaimed, in the hearing of her maid, "There's the state troopers." A few minutes later Ignatius Cannone drove past the roadblock on his way to Barbara's. At about 1:15, Bartolo Guccia, in his pick-up truck, drove down

3. Brief for the United States, p. 8.

4. The only witnesses for the defense were those called by Montana as character witnesses and Profaci's attorney who testified as to why he had taken notes of the testimony of Joseph Barbara, Jr. before the New York State Commission of Investigation. A copy of those notes was found in the possession of Magliocco.

5. Brief for the United States, p. 55.

from Barbara's past the. parked police car and returned five minutes later. The jury could have concluded that Cannone and Guccia reported what they had seen, and that Guccia had been sent down the road to investigate.

During the next few hours, 58 men were stopped and asked to identify themselves. Of these, 35 were more or less perfunctorily questioned by state troopers, occasionally assisted by federal officers.[6] At 1:20 P.M. Emanuel Zicari and Dominic Alaimo drove past the roadblock and were stopped, on radioed instructions from Croswell, by other officers and asked to identify themselves. Next came Russell Bufalino in his Chrysler Imperial with Joseph Ida, Gerardo Catena, Dominick Oliveto and Vito Genovese. Upon being stopped at the roadblock, they all identified themselves. Bufalino said that he had come to visit his sick friend, Barbara. Vito Genovese remarked that he understood that he did not have to say anything and he said nothing. Ida, Catena, and Oliveto said nothing about the meeting and apparently were not asked about it. Other cars, driven by Joseph Magliocco, John Ormento, Pasquale Turrigiano, Anthony Riela, Pasquale Monachino, Joseph Falcone, Vincent Rao, Joseph Barbara, Jr., Cannone and Guccia, were stopped in the next few minutes. Passengers in these cars were Joseph Profaci, Sam Monachino, Pasquale Sciortino, Anthony Guarnieri, Salvatore Falcone, Rosario Mancuso, Dominick D'Agostino and Sam Lagattuta.

After it began to rain, at about 2:30 P.M., the officers took those stopped at the roadblock to the Vestal barracks located about seven miles away. So treated were Santo Trafficante, James Osticco, Frank DeSimone, Joseph Civello, Simone Scozzari, Joseph Rosato, Natale Evola,. Frank Cucchiara, Carmine Lombardozzi, Joseph Riccobono, Paul Castellano, Carlo Gambino, Michele Miranda, Armand Rava, Constanza Valenti, Frank Valenti, Angelo Sciandra, Charles Chiri, Mike Genovese, Gabriel Mannarino, and Salvatore Tornabe.

At about 1:45 P.M., A.T.U. agent Brown had seen eight or ten men walking in single file toward some woods and pastures behind Barbara's house, and A.T.U. agent Ruston had seen three or four running in the open away from the house. Four of these men were apprehended in the fields—John Montana, Antonio Magaddino, Joseph Bonanno and Giovanni Bonventre. Between 2 and 2:30 P.M., a villager named Glen Craig saw Frank Majuri and Louis Larasso hitchhiking about three quarters of a mile from Barbara's and he gave them a ride. Agent Brown stopped Craig's car at about 3:00 P.M. and took Majuri and Larasso to the barracks. A New York State trooper found Frank Zito on the stoop of a house about a. mile from Barbara's, and James Colletti was found nearby. These eight and Roy Carlisi, John DeMarco, James LaDuca and John Scalish, on whom the record is not clear as to where they were apprehended, were also taken to the Vestal barracks for questioning.

**B. The Statements Made on November 14 and Thereafter[7]**

Of the 58 men who were stopped by the officers on November 14, only 36 were then questioned beyond mere identification, and of these only 27 then gave some explanation for their presence in the area.[8] None of them suggested that they

---

**6.** All the appellants urge that their detention was illegal and that any statements given by them during such detention were inadmissible as the statements were taken in violation of their constitutional rights. We find that it is unnecessary to consider these claims as we conclude that on all the evidence, including that so objected to, the government failed to prove the charge of conspiracy. Therefore, we do not pass on the trial judge's ruling, reported at United States v. Bonanno, D.C., 180 F.Supp. 71, upholding the legality of the police procedures.

**7.** These are summarized in the following text and set forth more fully in a 25 page appendix which we have filed with the clerk and which we do not publish because of its length.

**8.** Those who gave no explanation but were questioned beyond mere identification

had been invited to a gathering for other than social purposes and only three said that they had been invited at all. The most common explanation, given in one form or another by ten[9] was that the purpose of the visit was to call upon Barbara, a sick friend. Eleven gave other explanations for their visit to Barbara's. Of these, three[10] said they were invited to a party by Bufalino; three[11] gave personal business reasons; two[12] claimed that they came along with others for the trip; one, Profaci, said that he was visiting an old friend; one, Magaddino, stated that his companion's car had broken down nearby; and one, Guarnieri, insisted that he came for a good meal. Six[13] denied being at Barbara's, and gave some other reason for their presence in the area.

Of the 58 men identified on November 14, forty-three were questioned after that date and of these 35 then gave some explanation for their presence in the Apalachin area.[14] Most of the Apalachin visitors were questioned both on November 14 and on later occasions, many of them several times.

As on November 14, none stated that he had been invited for other than social purposes. Again, the most common explanation, given by fourteen,[15] was that the purpose of the visit was to call upon a sick friend or to accompany someone doing so. A related explanation was given by one, Castellano, who said he had accompanied a relative who wanted to see Barbara to discuss a similar heart condition. Nineteen gave other explanations for their visit to Barbara's. Of these, seven[16] said that they had a personal business reason for coming; three[17] said that they had been invited to a party; two[18] that they had accompanied friends on business trips; two[19] that their car had broken down; one, Zicari, that he came to see a friend; one, Riccobono, that he went for a ride; and one, Lombardozzi, that he came to hunt. Three[20] denied being at Barbara's and gave some other reason for their presence in the area.

## C. The Insufficiency of the Evidence

The government introduced enough evidence to justify a finding that Barbara had made preparations for a large gathering for other than social purposes and that some, if not most, of these present had been invited to attend.[21] The government contends that the common thread which can be traced through all the alleged conspirators' stories is their concealment of the fact that a meeting was planned in advance. From this the

---

were Castellano, Cucchiara, Evola, Gambino, M. Genovese, V. Genovese, Lombardozzi, Mannarino, and S. Monachino.

9. Bufalino, Colletti, J. Falcone, Montana, Riccobono, Riela, Sciandra, C. Valenti, F. Valenti, and Zito.

10. Civello, DeSimone, and Scozzari.

11. Cannone, Guccia, and Osticco.

12. Mancuso and Sciortino.

13. Carlisi, DeMarco, LaDuca, Larasso, Majuri, and Scalish.

14. Those who were questioned but gave no explanation for their presence in the area were Alaimo, Bonventre, Colletti, DeMarco, M. Genovese, V. Genovese, LaDuca, and Rao.

15. Bufalino, D'Agostino, Evola, Ida, Mannarino, Miranda, Ormento, Profaci, Rava, Riela, Sciandra, Tornabe, C. Valenti, and F. Valenti.

16. Cannone, Guarnieri, Guccia, P. Monachino, S. Monachino, Osticco and Turrigiano.

17. Civello, J. Falcone and Scozzari.

18. Maglicco and Sciortino.

19. Magaddino and Montana.

20. Larasso, Majuri and Scalish.

21. Barbara had ordered 242 pounds of meat for pick-up on November 14; he had reserved six rooms in a nearby motel for the previous night and accommodated at least four guests in his home; and he had helped five or six men reconfirm airline reservations in Binghamton on the morning of the 13th. His son made several trips to pick up visitors on the 14th. Moreover, the time and place of the gathering, the distances from which many had come and the all-male composition of the group belie the insistence of many that presence was only casual and social.

government argues that in the 40 minutes from 12:40 to 1:20 P.M. there must have been an agreement on the part of some to obstruct justice by giving false and evasive testimony to the effect the meeting was not planned and that before midnight of the same day the other alleged conspirators associated themselves with the venture. We disagree.

The fact that none of those present admitted that he was asked to attend a meeting for other than social purposes and that at least some of those present must have lied, does not warrant a jury's conclusion that any or all lies were told pursuant to an agreement made on November 14. There is nothing in the record or in common experience to suggest that it is not just as likely that each one present decided for himself that it would be wiser not to discuss all that he knew.

Indeed, the pervasive innuendo throughout this case that this was a gathering of bad people for an evil purpose would seem to us to rebut any possible argument that only as a result of group action would any individual lie. Even an otherwise law abiding citizen who is stopped and interrogated by police, and who is given no reason for his detention and questioning, may feel it his right to give as little information as possible and even perhaps to respond evasively if he believes he might thereby be earlier rid of police inquiry. That others may at times go to the brink of truth, or beyond, is likely, particularly when, as may have been true in the present case, they know that the existing law does not require them to give a truthful account to police officers.

After November 14 there was every reason for each Apalachin attendant to decide on his own that he would give as little information as possible about the meeting. The Croswell discovery touched off nationwide publicity of such nature, intensity, and persistence, that there were few people in the United States who did not know, within a few days of November 14, about the Apalachin meeting and the suspicions of governmental authorities that it was a meeting of underworld overlords and their vassals, commonly credited with being members of the Mafia, called for various unknown but illegal purposes. The responses of the jury panel during the *voir dire* and the voluminous newspaper, magazine, and television extracts introduced by counsel for the defendants in support of motions for transfer or continuance of the trial attest to the notoriety of the Apalachin gathering. In the face of such a hue and cry, it is just as reasonable to suppose that each one present would of his own volition decide that the less he said about Apalachin, and the more innocent his statements made the occasion to be, the better for him.[22]

If a precisely similar explanation in support of a claim of casual attendance had been given by those present, rather than statements similar only in that they denied that presence was planned, this would be some evidence of agreement. But in our view the similarity of the stories told is insignificant under all the circumstances. Only a minority relied to any degree on Barbara's illness but even this is of little weight since Joseph Barbara, Sr., had in fact been suffering from a severe heart ailment from which he died before the trial.

We therefore conclude that there was insufficient evidence for the jury to find the defendants had, on November 14, entered into an agreement to commit perjury.

II

We conclude also that there was not sufficient evidence for the jury to find that the defendants knew or should have known on November 14 that they would be called to testify under oath concerning the Apalachin gathering.

The indictment charged a conspiracy to commit perjury and obstruct

---

22. The government contends that various conspirators bolstered each other's stories subsequent to November 14. If true, this evidence points to the existence of several smaller conspiracies, not to the one of which all are accused.

justice by giving false and evasive testimony. Evidence of the same intent or knowledge would be required to convict conspirators as to convict those charged with the substantive offense, Ingram v. United States, 1959, 360 U.S. 672, 677–678, 79 S.Ct. 1314, 3 L.Ed.2d 1503; United States v. Ausmeier, 2 Cir., 1945, 152 F.2d 349. The essence of perjury is that the untruthful testimony be given under oath, 18 U.S.C. § 1621. Falsehoods given before non-judicial inquiries are not encompassed within 18 U.S.C. § 1503, the federal obstruction of justice statute, United States v. Scoratow, D.C.W.D.Pa. 1956, 137 F.Supp. 620. Thus, even had the government proved that an agreement had been entered into, it would further have had to prove that the conspirators intended to lie under oath or that they envisaged proceedings where they would be called upon to testify under oath. This the government failed to do.

There was no direct evidence that those present at Barbara's foresaw or should have foreseen a formal investigation of the meeting.[23] Nor was there any circumstantial proof to support such a finding since there was no evidence that the meeting was called for an illegal purpose. Without evidence that the meeting was unlawful, the presence of state troopers in Barbara's driveway, and the fact that the troopers then parked their car off the road, probably to observe or stop cars as they left, would not suggest to those present that a more formal investigation should be feared. Nor does the mass exodus from the Barbara place in response to the police curiosity show more than that those leaving did not care to subject themselves to further police scrutiny.

Without a showing that the gathering was in fact concerned with the commission of some unlawful act, the fact that federal grand juries later chose to inquire into the affair is wholly irrelevant to the question of whether the appellants on November 14 thought that such inquiry was likely. From the very nature of the process of investigation, grand juries must frequently act on suspicion to try to find what the facts are. But to infer from their activity that the state of facts which they or the government suspected, but never found, actually existed and, therefore, that the appellants must be held to have foreseen their inquiry is a boot-strap argument which is wholly unwarranted.

We therefore conclude that there was insufficient evidence to support a finding that the defendants knew or should have known that there would be any formal investigation under oath.

### III

Although the insufficiencies of proof dispose of these appeals, we feel it appropriate to comment on several other features of the prosecution and trial of this case. Since the jury was instructed that it would have had to find, as to each

---

**23.** Evidence with respect to past grand jury inquiries concerned only four of the defendants and even these inquiries were not shown to have any connection with the Apalachin gathering. Evola and Sciandra had been subpoenaed and had appeared before grand juries in the Southern District of New York between June 1956 and March 1957, and they had not been advised by November 14, 1957 that the subpoenas had been discharged. Moreover, Ormento, Evola, Sciandra and Bufalino had some proprietary interest in companies whose records had been subpoenaed by grand juries and had not been returned before November 14. But since this testimony was properly limited by the trial judge so as to be admissible only against those defendants and since, as the trial judge charged, they could not be used to prove that the defendants were then under suspicion (since they may have been called as witnesses), the jury could not conclude from this evidence that they, or any of the others, foresaw a grand jury investigation of the gathering. Nor was there any connection shown between the prior grand jury investigations and the Apalachin gathering which would permit and rationally support an inference that those who had been subpoenaed, even if they were the subjects of the earlier investigations, should reasonably have foreseen the possibility of renewed interest by the grand jury in their activities as a result of their presence at Barbara's.

defendant, that he did, in fact, lie, in order to number him among the conspirators, it had to consider the truth of each defendant's story separately. There was ample basis for the jury to conclude that some, if not most, of the stories were false since it is extremely unlikely that such a number of men would convene uninvited, some from distant places, on a weekday, in a secluded country town. It is fallacious, however, to reason that the falsity of most stories establishes the falsity of each; and improper to permit the jury to substitute a feeling of collective culpability for a finding of individual guilt.

■ As appears from our discussion, the government's case rested on the jury's consideration of the many statements made by those present at Barbara's on November 14. The jury had to evaluate what 59 (Joseph Barbara, Sr. and the 58 who were identified) men did on November 14, and, in addition, had to analyze the testimony of 84 witnesses, many of whom testified to statements of the alleged conspirators. In addition the jury had before it sworn testimony in question-and-answer form taken before various governmental bodies including the New York State Liquor Authority, the United States Immigration and Naturalization Service, and grand juries both state and federal. We have found the analysis and the comparison of these statements most difficult; it is virtually impossible to keep them separately in mind and to weigh them without considerable study and without voluminous notes and indices.[24] Courts have long indulged in the somewhat naive supposition that jurors can properly assess such evidence and determine from it the individual guilt of each of many defendants, even when aided by a careful summary

of the evidence such as Judge Kaufman gave here. This makes it especially important for trial and appellate courts to determine the sufficiency of the evidence as to each defendant in mass conspiracy trials. Cf. Developments in the Law: Criminal Conspiracy, 72 Harv.L.Rev. 920, 980–83 (1953); Note, The Conspiracy Dilemma: Prosecution of Group Crime or Protection of Individual Defendants, 62 Harv.L.Rev. 276, 284 (1948).

The flimsiness of the evidence against appellant Cannone and co-conspirator Guccia demonstrates the danger of a shotgun conspiracy charge aimed at everyone who gave an explanation inconsistent with the government's suspicion of the purpose of the gathering. Both Cannone and Guccia were residents of Apalachin. According to undisputed evidence, both were old friends of Barbara and frequently visited him. The explanations they gave were in no way implausible and did not refer to a visit to a sick friend. Cannone, who arrived at 12:55 P.M., after the police had set up their roadblock, stated that he had come to get advice about the purchase of equipment for his bar. He concededly managed a tavern nearby and Barbara's business interests were along similar lines.[25] Guccia said that he had come to sell some fish. There was no testimony given by anyone else which even suggested that these explanations were false. Indeed there was not a shred of evidence, even giving weight to the hearsay aspect of the numerous statements before the jury, to show that Cannone and Guccia did not visit for the reasons given; there was no possible basis for concluding that they conspired with anyone to give false explanations about their visit or that they had any motive for falsifying.

---

24. The jury's request for the testimony of Ormento at Vestal, when there was no evidence that he had ever been there, is a striking example of these difficulties. See also the appendix filed with the clerk of this court which gives some idea of the detail which the jury was required to master.

25. On November 14, 1957 Barbara held the Canada Dry franchise for the Apalachin area. In the past he had distributed alcoholic beverages and attended several conventions of beer distributors.

We must suppose that the jury convicted a defendant such as Cannone, and that the government named individuals such as Guccia as co-conspirators, only on the theory that everyone at Barbara's was a participant in some illegal activity and that all had an interest in concealing what could not be proven. The danger of sweeping within the net of such a conspiracy an innocent visitor whose honestly told story may in its omissions have coincided with some falsehood told by others calls for special precautions in this type of case.

Moreover, the government here charges the defendants with a conspiracy to commit perjury proved solely by evidence of lying without attempting to prove that the underlying substantive crime has been committed. It should not be forgotten that where the government charges the crime of perjury the law requires the testimony of two witnesses, or at least evidence stronger than the mere word of one man against another. Weiler v. United States, 1945, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495; United States v. Remington, 2 Cir., 1951, 191 F.2d 246, certiorari denied, 1952, 343 U.S. 907, 72 S.Ct. 580, 96 L.Ed. 1325; United States v. Collins, 2 Cir., 1959, 272 F.2d 650.

In this case the government circumvents the salutary requirements of proof in perjury cases in two respects. In the first place, with respect to all the November 14 statements, and most of the statements made thereafter, the alleged lies were not told under oath or under circumstances where the truth was required. Secondly, the government was not required to prove, and did not prove, by the traditional perjury standard that any single witness before a grand jury lied as to any material matter. Moreover, the government has not even been required to make a specification of what the claimed perjury was as to any particular witness.

We doubt the advisability of requiring that the government meet any absolute standards in conspiracy cases. At the same time we cannot state too strongly our view that it is incumbent on trial judges, in deciding whether the government has made out a sufficient case to go to the jury, to analyze with meticulous care the evidence as to each defendant. When this is not done, it is the duty of the appellate courts to act. Cases such as this prove all too well the need for the caution which from time to time has been articulated by the Supreme Court with respect to the indiscriminate indictment of numerous defendants in conspiracy cases. What Mr. Justice Jackson, joined by Justices Frankfurter and Murphy, warned against in his concurrence in Krulewitch v. United States, 1949, 336 U.S. 440, 449–454, 69 S.Ct. 716, 93 L.Ed. 790, anticipates the disturbing features of this case. See also Yates v. United States, 1957, 354 U.S. 298, 330 n. 36, 77 S.Ct. 1064, 1 L.Ed.2d 1356.

The government is not without resources to make inquiry about matters of possible public concern. If false testimony is given under oath a prosecution for perjury may be brought. Even those who block the road by asserting their rights under the Fifth Amendment may, under many statutes,[26] be compelled to answer as they thereby become immune from prosecution regarding the matters concerning which they are forced to talk. If, after having received immunity, such witnesses testify falsely they may still be prosecuted for perjury. If they refuse to testify they may be committed for contempt.[27]

26. See, e. g., United States v. Brown, 2 Cir., 1957, 247 F.2d 332, 337 n. 5.

27. The many inquiries which followed the Apalachin gathering resulted in numerous proceedings under § 406(3), New York Civil Practice Act, but, so far as we are advised, no one present has thus far been tried for perjury. The three counts in the indictment before us, charging Profaci, Magliocco and Turrigiano with perjury, appear to be the only federal charges of perjury which have been brought.

Seven of the appellants (Castellano, Lombardozzi, Mancuso, Miranda, Riccobono, C. Valenti, and F. Valenti) spent seven months in civil jail when, despite an offer of immunity from state prosecu-

The administration of our system of criminal justice and our basic concepts of fair dealing are centered on the requirement that in each case we reach a result based solely on the charges made in the particular indictment and on the evidence which appears on the record with regard to those charges. Doubtless many of Barbara's visitors are bad people, and it is surely a matter of public concern that more is not known of their activities. But bad as many of these alleged conspirators may be, their conviction for a crime which the government could not prove, on inferences no more valid than others equally supported by reason and experience, and on evidence which a jury could not properly assess, cannot be permitted to stand.

Reversed and remanded with directions to dismiss the conspiracy count of the indictment.

CLARK, Circuit Judge (concurring).

I agree with the decision and opinion herein, but believe it desirable to point out what seems to me an even more basic failure of proof than the two so fully delineated by Chief Judge Lumbard.

Perhaps the most curious feature of this strange case is the fact that after all these years there is not a shred of legal evidence that the Apalachin gathering was illegal or even improper in either purpose or fact. For thirteen years prior to the meeting as a modern Inspector Javert State Trooper Croswell pursued Barbara, Sr., in all ways possible (including tapping of his telephone) and got no evidence of illegality, although he did get wind of the meeting if not of its purpose. After it occurred on November 14, 1957, there were no less than 133 examinations of those present (as the government reports in its brief) by various state and federal officials, including 27 instances before federal grand juries and 29 by the FBI. The results were fruitless, as is highlighted by the government's frank admission at the outset of the trial that it would not be able to show what was going on at the meeting. The only suggestion, outside of an innuendo not here provable that the defendants were evil,[1] is the bizarre nature of the gathering itself. But that gets us nowhere; common experience does not suggest that plotting to commit crime

tion, they refused before the New York State Commission of Investigation to answer questions on the ground that the answers might incriminate them. After their indefinite confinement had withstood attack in the New York State courts, Commission of Investigation v. Lombardozzi, 1959, 5 N.Y.2d 1026, 185 N.Y.S.2d 550, 158 N.E.2d 250, appeal dismissed as moot sub nom., Castellano v. Commission of Investigation, 1959, 361 U.S. 7, 80 S. Ct. 51, 4 L.Ed.2d 49, appeal dismissed and certiorari denied sub nom., Mancuso v. Commission of Investigation, 361 U.S. 10, 80 S.Ct. 59, 4 L.Ed.2d 50, relying upon Knapp v. Schweitzer, 1958, 357 U.S. 371, 78 S.Ct. 1302, 2 L.Ed.2d 1393, at least some of them gave answers which were characterized as "false, evasive and obstructive." As a consequence, they were returned to jail, there to remain until they gave testimony which was not false, evasive and obstructive. The Court of Appeals held further detention without trial proper, even where questions were answered, if the answers were "evasive" or "incredible." People ex rel. Valenti v. McCloskey, 1959, 6 N.Y.2d 390, 189 N.Y.S.2d 898, 900, 160 N.E.2d 647,

appeal dismissed for want of a "properly presented" federal question, 1960, 361 U.S. 534, 80 S.Ct. 585, 4 L.Ed.2d 537; cf. People ex rel. Valenti v. McCloskey, 1960, 8 N.Y.2d 959, 204 N.Y.S.2d 188, 168 N.E.2d 853.

This footnote does not purport to be a complete summary of the proceedings in other tribunals involving the Apalachin meeting.

1. As obviously not within the present indictment. In a state charge of contempt against the two Valentis, alleged coconspirators here, for refusing to testify before a state commission, the court described the Apalachin gathering as "an all-male meeting, in a rural private home, *with an unusually large attendance of persons with criminal records.*" (Emphasis added.) People ex rel. Valenti v. McCloskey, 8 A.D.2d 74, 185 N.Y.S.2d 952, 964, 965, affirmed as to one defendant and reversed as to the other by a sharply divided court, 6 N.Y.2d 390, 189 N.Y.S.2d 898, 160 N.E.2d 647. But the fact there stressed was not before the present jury, except in most indirect and limited instances.

is done in convention assembled, or even the converse, also suggested here, namely, plotting to desist from crime. It must be taken, therefore, that for aught we can know the gathering was innocent.

On this basis the defendants would appear to be under no duty to explain their actions, and this the prosecution freely admits, saying in its brief that "the government has never taken the position that the defendants were guilty of wrongdoing by merely failing to reveal what occurred at the Apalachin meeting." This being admitted it is difficult to see how a defendant commits a wrong if he endeavors to preserve his privacy and individual freedom by misleading answers not perjurious in character.[2] True, there might arise circumstances where a defendant's concealment would raise questions of propriety, as where he was concealing an actual crime. But under the circumstances here present, where no crime is indicated, some proof of illegality in the actions concealed would seem an essential to any conviction on either a substantive or a conspiracy count. For otherwise it would seem that a citizen's privacy is subject to invasion at any time on the mere suspicion of any police officer, federal, state, or local, and the presumption of innocence has no potency at the police level.[3]

From its inception this case was given unusual and disturbing publicity in newspapers, journals, and magazines; and this unfortunate feature has persisted up to this date, with even the prosecutors indulging in highly colored accounts while the case has been pending on appeal. Much of this has been in terms of a crisis in law administration seemingly demonstrated by an unexplained gathering of arch criminals and of a general satisfaction that somehow they have now met their just deserts of long imprisonment. This is vastly unfortunate; not only does it go beyond the judicial record necessary for its support, but it suggests that the administration of the criminal law is in such dire straits that crash methods have become a necessity. But it seems we should have known better, and a prosecution framed on such a doubtful basis should never have been initiated or allowed to proceed so far. For in America we still respect the dignity of the individual, and even an unsavory character is not to be imprisoned except on definite proof of specific crime. And nothing in present criminal law administration suggests or justifies sharp relaxation of traditional standards.

■ Chief Judge LUMBARD and Judge FRIENDLY authorize me to state that they agree with the writer that the publication by former special prosecutors of accounts and comments regarding this case and the appellants, while this appeal was pending, was improper.

---

2. The absence of prosecutions for perjury—noted in Chief Judge Lumbard's opinion—is striking. As he further notes, there have been state attempts to produce evidence by the contempt process, but without substantial results. After the release of the one Valenti, as noted in note 1 *supra*, the other secured absolution by testifying in so contrived a way as—in the words of the dissenting judges—"to leave the Commission of Investigation without any useful or material information not already known concerning the so-called Apalachin meeting." People ex rel. Valenti v. Mc-Closkey, 8 N.Y.2d 959, 204 N.Y.S.2d 188, 189, 168 N.E.2d 853, affirming People of the State of New York ex rel. Valenti v. Sheriff of City of New York, 10 A.D. 2d 684, 197 N.Y.S.2d 742. The government's concession is therefore justified on practical as well as legal grounds.

3. Thus the detention, transportation to the distant Vestal police station, and search there of most of the defendants on the afternoon of November 14, 1957, seems highly dubious, and the admission of their statements in evidence of doubtful validity. So the court's ruling supporting admissibility in United States v. Bonanno, D.C.S.D.N.Y., 180 F.Supp. 71, would seem at variance with Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134, and the rationale there set forth. (This is one of several additional problems which is not explored in detail because of the reversal here ordered; others include the venue as laid in the Southern District, and not the Western, where Apalachin is located, the sufficiency of the indictment, the scope of the charge, and the possibility of prejudice from the pre-trial publicity.)