No. 29,433.

J. Fred Allen, *Appellee*, v. Margaret Allen, *Appellant*.

(295 Pac. 705.)

Opinion filed February 7, 1931.

*I. T. Richardson,* of Emporia, *J. N. Tincher, Don Shaffer* and *Rubert G. Martin,* all of Hutchinson, for the appellant.

*W. C. Harris, O. S. Samuel, W. L. Harris* and *Vernon J. Vernon,* all of Emporia, for the appellee.

The opinion of the court was delivered by

Johnston, C. J.: This action was brought by J. Fred Allen to obtain a divorce from his wife, Margaret Allen. The trial resulted in a judgment for plaintiff, granting a divorce to him based on the fault of defendant and making a disposition of the property interests of the parties. The defendant appeals and assigns numerous errors and rulings on motions directed at the pleadings, the denial of a motion for a change of venue or a change of judges, adverse rulings in the admission of evidence; insufficiency of the evidence to sustain the judgment; and prejudice on the part of the judge in giving consideration to testimony obtained elsewhere than in the evidence produced in court, and some other statements, rulings and acts which, it is claimed, established prejudice as well as the refusal of the court to grant a new trial.

The parties to the action were married on December 24, 1924. At that time plaintiff was about sixty-seven years old and a bachelor, while defendant was a widow about fifty-five years of age. She had been married twice before her marriage to plaintiff, her first husband had died and she had procured a divorce from her second husband. Plaintiff and defendant had lived together as husband and wife for about five years before this action was brought. In his petition, filed on March 28, 1929, plaintiff complained that defendant had been guilty of extreme cruelty, in that she was quarrel-

some, interfered in the building of their home and required that he turn off certain carpenters that were employed, and had demanded changes of plans that cost extra money and that in "flare-ups" she called him bad names, sometimes accompanied with profanity; that she had objected to his visiting with some of his friends, and had charged him with having improper relations with a woman who had previously been his housekeeper. It was further charged that she demanded that certain property should be conveyed to her, and that he make a new will giving her one-half of his property. It was further said that after quarrels she would not speak to him for a half a day at a time, and on occasions had threatened to kill herself. That she pretended to be sick when there was no reason for it, and had required him to attend her much of the time, to the interference of his business and comfort, and there was also a charge of "back seat" driving of an automobile. Quite a number of incidents are related as to family discords and fussing, many of which seem of little importance as evidence of extreme cruelty.

The court found the allegations of the plaintiff's petition to be true and gave judgment for him, awarding her alimony in the sum of $14,000 and a division of personal property, although defendant alleged and claims that plaintiff is a man of large means, fixing his estate at $200,000, while plaintiff claimed that it did not exceed $55,000. It may be said that there was contrary evidence given in behalf of the defendant as to the charges of misconduct.

The principal complaint of the defendant is that the court was prejudiced against her and she calls attention to a number of rulings and acts which she insists manifest partiality for plaintiff and prejudice against her. When the case was instituted a change of judges was asked by defendant, which was refused. Attention is called to the fact that the court made an order enjoining the defendant from entering the home which the parties had built and had been occupying for a period of years. It is shown that she had gone on a visit to friends in Newton and plaintiff accompanied her to the train, the arrangement between them being that he would join her in Newton on the following Saturday, after which they would return together. Some of his clothing had been placed in her suitcase for his use when he went to spend the week-end with her at Newton. It further appears that there was a friendly parting, and yet the plaintiff instituted the action the following morning, when the order was granted restraining her from entering the home. It should

be said that this injunction was later set aside by the court and the defendant permitted to return to her home, but then he only allowed her $50 a month to maintain a large home, and provide her a living.

Complaint is made of a hostile attitude on the part of the court, evidenced on one occasion when counsel for defendant were lectured or criticized by the court for calling so many witnesses. It is said the court reproved counsel because he had or was going to subpœna 127 witnesses. Counsel for defendant says that he had said to counsel for plaintiff that he had 85 witnesses to support the claims of defendant, and that he had only subpœnaed a few witnesses, and counsel asks where did the court obtain the information. When this complaint was made after the trial the court stated that he had been told by the sheriff that this number of witnesses had been subpœnaed. The incident of itself is not a matter of importance and cannot be regarded as establishing prejudice of the judge. Nor do we regard the other ground that the trial judge stopped on his way from the court room and explained to defendant and some other women why he had made certain rulings, adverse to the defendant, as being material proof of prejudice on the part of the judge.

After the evidence had been produced and before the argument was commenced, the court, it appears, announced that the contending parties should come to his chambers as he wished to meet them alone there. The affidavit of defendant presented on the motion for a new trial, relating to the private interview with the plaintiff and defendant, states in effect that counsel for defendant then addressed the court and stated in substance that he guessed he did not understand the court, that surely the court did not mean to ask the plaintiff and defendant to meet him in conference after all the proceedings and at that juncture. The court again assured Mr. Richardson that such was his wish. The judge retired to his chambers, followed by plaintiff and defendant. The defendant asked the judge if they were not to have the reporter and the judge said, "No, this is to be man to man, without reporters, lawyers, or anyone else." Among other things, the affiant stated in effect that the judge urged the parties to attempt a reconciliation and if that was not effected to agree upon a compromise and settlement of their property interests. He discussed with them features of the evidence relating to charges made by the defendant against her husband, and also indi-

cating a weakness of plaintiff's case as a reason for a settlement and the avoidance of further litigation by way of an appeal. Affiant said that these and other matters urged upon her by the judge for a considerable time caused her great humiliation and distress. When the affidavit was presented, the court reading the portion of it with reference to the part where Mr. Richardson, counsel for defendant, had asked the judge if he meant to ask the plaintiff and defendant to meet him in conference alone, etc., and the court assured him that was his wish, the court asked Mr. Richardson, "Did that happen?" Richardson says, "I don't know the exact wording." The court: "Didn't you ask me to take these people in there and talk with them; just as I did, Judge Richardson? A. No, you are referring to a conversation had at the early part of the trial, in which you said you wanted to do that." After reading the part of the affidavit in which defendant asked the judge if they were not to have a reporter, and his reply was, "No, this is to be man to man, without reporters, lawyers, or anyone else," the court said nothing of the kind happened at all, and then remarked: "I took these two, as I recall it, at the suggestion of Judge Richardson, a good friend of mine, took these two into the back room in an effort to talk this matter over." And after a further colloquy with counsel in relation to it the court remarked: "I don't think that has anything to do with the motion for a new trial." And after a further parley the court remarked: "It sort of looks like the court is to be tried here instead of a matter of right and justice between these two." The court, however, permitted the affidavits to be marked as exhibits and offered in evidence. In explanation of the contents of the affidavits the judge made the following statement:

"THE COURT: I cannot resist this observation. The court has feelings, of course, the same as anybody else. Judge Richardson occupied this bench before I came in here. I had thought that, throughout the trial of this case, six or seven days, that I was extending to you gentlemen every courtesy that it was possible to extend. Naturally, when it was heard, the court must make some decision. Unless he makes that decision as to what he feels is right, he is a hypocrite. As I take it, all the time, you have a right to complain of error in the rulings of the court, because none of us is perfect. The court might, in an unthoughted moment, make a ruling or permit evidence that ought not to go into the record. Those things are rightly complained of, but it just seems to me, and I am wondering whether or not you are treating the court right—not me but a court of any district, right—when you complain of conversations he may have had, recitations that he is criticized as

he passes through the halls, recitation of what happened here in the back office, when the court asked them to embrace one another, and all that tommyrot. To me, it is one of the most discouraging things I have ever come up against."

There is a dispute as to what transpired in the private hearing in the chambers of the court, but it is evident that the court did not intend that counsel should be present or that a record of what transpired in the chambers should be made by the reporter. It would seem that the court was transformed into a sort of conciliation tribunal and at a time when the parties were in a belligerent attitude and had been during a trial which had lasted about a week and down to the conclusion of the evidence. There may have been a time when a reconciliation might have been desirable and practicable. It was quite manifest that the proceedings had reached a stage where concord between the parties could hardly be brought about, even through the efforts of one with the prestige and power of a trial judge. The interview or hearing, although called by the judge at the trial and to be held "without reporters, lawyers or anyone else," cannot be regarded as a judicial hearing and the facts learned in this secret manner used in the determination of the issues of the case. The proceeding being announced in the court at the trial could not well be resisted by the defendant, and being in a sense forced upon her at that time and place, a compliance with the judge's order is easily understood. Efforts to bring about a reconciliation of matrimonial clashes is not to be condemned or discouraged, if undertaken at opportune times and by friendly intervention of one in whom both parties have confidence, and to whom they are willing to listen. Uninvited and compulsory intervention is more likely to create discord than it is to bring a cessation of strife, and it appears that the defendant at least did not welcome the nonjudicial interference of the judge, taken as it was during the pendency of the trial.

Another feature of the case is cited to show injudicial and improper conduct, and that the judge was not in a proper state of mind to try and determine the issues submitted to the court. After the arguments of counsel had been concluded, and on December 12, 1929, the court rendered judgment for the plaintiff, as already shown, which included the granting of alimony and a division of property. The judgment entry was handed down by the court on December 12, 1929, and it recited that defendant should have all

of the household goods except the cook's bedroom suit, bedding and rug that was in the bedroom downstairs; six silver knives; six forks; six tablespoons; six teaspoons; six soup spoons; six salad forks; the silver pitcher given plaintiff by his brother, Judd; the silver dish given plaintiff by his brother, Judd; all pictures that were given to plaintiff; a large easy chair, and stool; the walnut stool that belongs to the desk of plaintiff; the washing machine, tubs, etc., the breakfast-room suite; all the furnishing in the room known as the den; all draperies and curtains in the home of the parties on Neosho street; one-half of all bedding and table linens; one quilt that was given plaintiff by his mother; the large rug in the living room; two bridge lamps to be selected by plaintiff; one set of field glasses belonging to Captain Edwards; the kelvinator; the gas range; and the radio and all personal effects of said plaintiff in the house on Neosho street.

It is urged that there was no evidence produced which gave the court any information that the numerous articles mentioned in the judgment entry were in the home of the parties, anything giving the court a definite description of the articles, nor yet the source from which they were obtained by the parties. In a search of the record we have been unable to find any showing pertaining to the existence of these articles, the minute description of them or the persons from whom the court obtained knowledge of them. It is clear that the information was not gained from the testimony produced in the record. No explanation of this unusual and unlawful action has been furnished. The division of property was an important feature of the action and the final judgment to be rendered and the determination of the question should be based on evidence produced at the trial in the presence of the contending parties or their counsel. Such a departure from judicial propriety cannot be sanctioned nor overlooked. It appears that an appeal was taken from this judgment within a few days after it was rendered. Upon notice given to counsel that a modification of the judgment would be made, the court on January 11, 1930, took up the matter of modification of the judgment previously entered and modified it only by the elimination of the household goods as listed and described in the judgment. The change made was that:

"Household goods and furnishings of the parties shall be divided equally in kind and the court retains jurisdiction of the cause for the purpose of making any other or further orders necessary for the equal division of such household goods and furnishings in the event said parties cannot mutually agree as to such division thereof."

Later an appeal was taken from the second or modified judgment.

The subsequent action of the court in striking out the enumeration of the household goods on January 11, 1930, is not a valid excuse for the finding made in December without evidence or upon information gained from persons other than witnesses testifying in the case. We conclude that there was cause for the complaint of defendant and that the case should be tried again in the ordinary judicial way by a judge free from the objections which have been mentioned.

We are not warranted in taking up and determining the questions as to whether extreme cruelty was shown or the other questions that were in issue in the case, as these should be tried by a judge against whom a charge of prejudice or partiality cannot be sustained.

The judgment is reversed and the cause remanded for a new trial.