STATE OF CONNECTICUT *v.* MICHAEL V. SMITH

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. MV 1-30218

Argued July 6—decided November 26, 1965

*Arthur B. O'Keefe, Jr.,* of New Haven, for the appellant (defendant).

*Benjamin F. Ferris,* special assistant prosecuting attorney, for the appellee (state).

PRUYN, J. On his appeal from his conviction after a trial to the court for the crimes of reckless driving (General Statutes § 14-222) and negligent homicide (General Statutes § 14-218), the defendant has assigned as error the refusal of the court to correct the finding as requested by him, the admission and exclusion of evidence, the denial by the court of his motion to dismiss, the bias and prejudice of the court exhibited against the defendant and his attorney, and the court's conclusion upon all the evidence that the defendant was guilty of the crimes charged beyond a reasonable doubt.

In view of this last assignment of error, we determine from the entire evidence whether the court

erred in concluding that guilt was established beyond a reasonable doubt, thus making it unnecessary to consider in detail the numerous claims for correction of the finding, since the rights of the accused are fully protected by our comprehensive examination of the entire evidence; we consider the finding, however, for the purpose of showing the specific facts found by the court upon conflicting evidence. *State* v. *Pundy,* 147 Conn. 7, 8; *State* v. *Foord,* 142 Conn. 285, 286; *State* v. *MacCullough,* 115 Conn. 306, 307.

The assignment of error in the denial of the defendant's motion to dismiss the information at the close of the state's case we do not consider, since it has repeatedly been held both by our Supreme Court and also by this court that such a denial is not assignable as error. Maltbie, Conn. App. Proc. § 212.

At about 4:05 in the morning of Tuesday, June 23, 1964, a beige-colored 1964 Ford station wagon containing two occupants, the defendant and Nancy Hitchings, traveling at a fast speed northerly on Mansfield Avenue in Darien, failed to make a general curve to the left at Mansfield Place, crossed the curb, after leaving 224 feet of light tire marks on the highway, continued on for 14 feet, went through 72 feet of privet hedge, uprooting most of it, continued on for 22 feet, crashed with its left front into a large tree, then traveled sideways with the front wheels about 3 feet ahead of the rear wheels and finally came to rest on all four wheels 52 feet from the tree, after leaving 16 feet of "dig" marks of torn-up turf 36 feet from the tree. The defendant was found unconscious, lying on the ground parallel to the car and 15 feet from the open right front door. Miss Hitchings was found apparently lifeless, with her left foot on the driver's side

of the hump in the floor of the car, her right foot on the floor on the right side of the hump and her body lying across the right of the right front seat with her head hanging out of the right front door. The car was extensively damaged on the left side, the left front door was jammed closed, the windows and windshield were broken, all four tires were flat, turf, sod and dirt were along the windshield and right door handle, grass was on the roof, and there were dents in the roof above the windshield and over the right front door. The only eyewitnesses to the accident were the two occupants of a car traveling in the opposite direction on Mansfield Avenue who saw the oncoming headlights of the car leaving the road and heard the crash.

The crucial question of fact which the trial court had to determine was whether the defendant or Miss Hitchings was the driver of the car. There was no direct evidence as to this. Miss Hitchings was dead, and the defendant suffered a loss of memory of the events preceding and subsequent to the accident. The circumstantial evidence was voluminous and in some respects conflicting. The state presented an expert witness, as did the defendant; each expert had eminent qualifications. The court examined the scene of the accident and also the car, which had been impounded by the police and had remained in the same condition it was in as the result of the accident.

The defendant claims error in six rulings on evidence. In the course of the investigation of the accident, the police officers questioned the defendant in the presence of his attorney. Some of the questions the defendant refused to answer on instructions of his attorney. The entire statement, including these questions and his refusals to answer, was admitted in evidence over the defendant's objection

on the ground that an adverse inference might be drawn from his refusal to answer. These were admissible, but no unfavorable inferences from his refusal to answer may be drawn by the trier. *Malloy* v. *Hogan,* 378 U.S. 1, 3; *Griffin* v. *California,* 380 U.S. 609, 613. The court did not permit the recross-examination by the defendant of a state's witness because the subject matter had not been testified to on redirect examination. This ruling was correct. *Mendez* v. *Dorman,* 151 Conn. 193, 198. The court admitted into evidence the testimony of one of the police officers who investigated the accident, and who was present at the coroner's hearing, concerning statements made at the hearing by the defendant and also admitted into evidence the transcript of the proceedings of the coroner's hearing. We need not determine whether this ruling was correct, for even if it were not correct, we do not regard it as prejudicial to the defendant in view of the considerable amount of other evidence of the same or like import. The remaining rulings on evidence, even if considered erroneous, were not harmful.

There was a conflict of testimony as to whether police officer Fraccola saw the defendant driving the car at 3:30 a.m. and whether Frank Genestra saw the defendant driving the car with Miss Hitchings in the passenger side of the front seat at 3:45 a.m. As it is the exclusive function of the trial court to determine the credibility of the witnesses, we look to the finding to see how the court resolved this conflict. The finding indicates that the court believed the testimony of Fraccola and Genestra that they saw the defendant driving at the times mentioned.

Likewise, there was a conflict in the opinions of the expert witnesses as to the action of the car after it hit the tree and as to whether the defendant or Miss Hitchings was the driver. "Conflicts in opinion

evidence offered by experts arise frequently in the trial of cases, and the trier has the duty of deciding which to credit." *Barr* v. *First Taxing District,* 151 Conn. 53, 59. "[T]he acceptance or rejection of an opinion of a qualified expert is a matter for the trier of fact unless the opinion is so unreasonable as to be unacceptable to a rational mind. . . . The trier can accept the testimony of the experts offered by one party and reject that of the experts offered by the other." *National Folding Box Co.* v. *New Haven,* 146 Conn. 578, 586. We cannot say that the opinions of the state's expert witness to which the court gave credence were unreasonable.

Both the defendant and Miss Hitchings had attended, on the evening before the accident, a large dinner party and subsequently a dance, both at private homes, at which were served intoxicating liquors which they both drank. Miss Hitchings had a blood content of alcohol of six-hundredths of one percent by weight. There was ample testimony to support the trial court's conclusion that the defendant was drunk. We note that in rendering its decision the court gave an oral memorandum of decision from the bench, a practice which is common in England but unfortunately rare with us, in which it commented on the credibility of witnesses and the physical evidence and then said: "I, therefore, conclude from the physical evidence more than anything else that Nancy Hitchings was the passenger and that you, Michael Smith, were the driver."

After examining the voluminous evidence of this nine-day trial, we cannot say that the court's conclusion that the defendant was guilty of the crimes charged beyond a reasonable doubt was erroneous.

The defendant next claims error in the court's refusal of his request that the court discontinue cross-examining his expert witness in the manner of

an advocate and examining the defendant extensively in the manner of a prosecuting attorney, and hectoring and badgering him. "The trial judge occupies an impartial position and one of commanding authority, and it often happens in a court-room that he may ascertain the truth when counsel has failed. Whether or not the trial judge shall question a witness is within his sound discretion. The extent of the examination is likewise within his sound discretion. . . . The judge must not exhibit bias or prejudice nor take sides. . . . The judge must never permit himself to become the advocate. . . . So long as he exercises his right to question a witness fairly his discretion will not be reviewed." *State* v. *Cianflone*, 98 Conn. 454, 469. "A judge is not an interlocutor presiding over a debate. He is a minister of justice. . . . To this end, he is empowered to exercise a reasonable discretion in the conduct of a trial." *McWilliams* v. *American Fidelity Co.*, 140 Conn. 572, 580. The entire examination of the defendant's expert witness, both in the courtroom and at the place where the car was located, to which the court had adjourned, including the extensive questioning by the court, was extremely lengthy and involved a considerable number of questions and answers relating to the path of the car after it struck the tree, whether it turned over, the effects of the crash on the occupants of the car, their positions in the car, the laws of physics, and other technical matters. It is apparent from the transcript of the proceedings that the court in its questioning was endeavoring to ascertain the witness' opinions in a fair manner for its own information. The court very closely questioned the defendant at considerable length concerning the events before and after the accident. This was done to try to bring out the facts more clearly, and not in the manner of an advocate or prosecuting attorney, bearing in mind the defend-

ant's loss of memory. The crux of the case was whether or not the defendant was the driver of the car, and the court had to decide this question. We conclude that the court, in its examination of these witnesses, "acted reasonably and within the exercise of . . . sound discretion, so that justice might be done." *Goggins* v. *Fawcett,* 145 Conn. 709, 713.

The defendant next claims that the court showed bias and prejudice against the defendant and his counsel by its remarks to his counsel during the trial and by issuance from the bench during the trial of this case of warrants for the arrest of all persons involved in furnishing liquor to the defendant and other minors at the parties on the evening preceding the accident. From the transcript of the proceedings of the trial, it appears that the court was patient but strict in requiring both counsel to comply with the rules of courtroom etiquette and decorum. We can find no bias or prejudice on the part of the court but rather a careful regard for the ascertainment of the true facts and for the rights of the defendant. As to the issuance of the bench warrants, the record is completely silent and there is therefore nothing for us to consider. The defendant in his assignment of errors claims that the court during the trial of this case ordered from the bench the issuance of the warrants and did not permit its remarks and orders to become part of the record. If the evidence in the case before us indicated to the court that other persons committed other criminal offenses, there was no reason why the court should not order their arrest and every reason why the court should. The claims of bias and prejudice are without merit.

The final assignment of error pursued by the defendant concerns the publication by the trial judge in the January, 1965, issue of McCall's Magazine,

during the pendency of this appeal and prior to the making of the finding, of an article by him concerning the case before us. The defendant claims that this violated his constitutional rights of privacy and due process of law. "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson* v. *Colorado,* 205 U.S. 454, 462. "From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law." *Gideon* v. *Wainwright,* 372 U.S. 335, 344. "The constitutional safeguards relating to the integrity of the criminal process attend every stage of a criminal proceeding, starting with arrest and culminating with a trial 'in a courtroom presided over by a judge.'" *Cox* v. *Louisiana,* 379 U.S. 559, 562; see *Rideau* v. *Louisiana,* 373 U.S. 723, 729 (dissenting opinion); *Estes* v. *Texas,* 381 U.S. 532. The sixth amendment to the United States constitution gives to an accused the right to a speedy and public trial, and so does the declaration of rights of the Connecticut constitution in article first. The defendant seeks to extend this constitutional right and the doctrine of the cases referred to above to an appeal, arguing that the article published in a national magazine of wide circulation might be read by any member of any appellate court who might hear an appeal in the case and cause him to have an opinion of the facts and the law prior to the presentation of the appeal in the appellate court. Such an argument is farfetched. Judges of appellate courts consider and decide cases on the basis of the facts and the law, with such help from counsel as briefs and arguments may provide, in an impartial manner,

uninfluenced by extraneous matters. The article complained of, entitled "The Sins of the Parents," is in effect a sermon on our present-day morality and the relationship between parents and children, using as a text the case before us, with changed names and some changed facts. The emphasis is placed on the furnishing of liquor by parents to minors. " 'The guilt of needless loss of life is in every living room in this community, and in the conscience of every parent who knew his or her child was going to be served liquor or who served liquor to a minor on that night. There is where the guilt lies.' " 92 McCall's Magazine, No. 4, p. 48 (January, 1965). The publication of this article during the pendency of this appeal we regard as improper and in poor judgment. *United States* v. *Bufalino,* 285 F.2d 408, 420 (concurring opinion). It does not, however, violate the defendant's right to a fair trial, which he had, and is not prejudicial as far as this appeal is concerned.

The defendant's remaining assignment of error, concerning merger of the two offenses, is deemed abandoned, not having been briefed or argued.

There is no error.

In this opinion JACOBS and KINMONTH, Js., concurred.

JACOBS, J. (concurring). The record shows that the trial of this case was commenced at Darien, Connecticut, on September 16, 1964, and lasted for a period of nine court days. It was concluded on October 13, 1964. The transcript contains some 1200 pages. After the trial was concluded and while the case was on appeal to the Appellate Division, the trial judge engaged in extrajudicial conduct in that he prepared and caused to be published in the January, 1965, issue of McCall's (vol. 92, No. 4,

p. 48), a nationally known magazine having a wide circulation, an article entitled "The Sins of the Parents," in which he used this case, adopting fictitious names, as a basis upon which to launch a campaign directed at delinquent parents who allow or permit their minor children to drink intoxicating liquor. The judge wrote (p. 48): " 'The guilt of needless loss of life is in every living room in this community, and in the conscience of every parent who knew his or her child was going to be served liquor or who served liquor to a minor on that night. There is where the guilt lies.' " The claim is advanced that such extrajudicial conduct constituted a deprivation of the defendant's right to due process of law under the fourteenth amendment. I agree with the majority opinion that this departure from judicial propriety on the part of the trial judge cannot be sanctioned nor overlooked. See *Allen* v. *Allen,* 132 Kan. 468, 473; *Commonwealth ex rel. Green* v. *Rundle,* 413 Pa. 401, 405 n.4; note, 73 A.L.R. 1011. But whether there has been in fact a denial of due process is still another matter.

The defendant places great reliance upon *United States* v. *Bufalino,* 285 F.2d 408, and *Estes* v. *Texas,* 381 U.S. 532. In the *Bufalino* case, a prosecution for conspiracy to commit perjury, the conviction was reversed on appeal and the case remanded with direction to dismiss the prosecution upon the ground of insufficiency of evidence in the government's case. Judge Clark, in a separate concurring opinion, sharply criticized (p. 420) the government prosecutors for "indulging in highly colored accounts while the case has been pending on appeal," and his views on this point were shared by Chief Judge Lumbard and Judge Friendly, who (p. 420) "agree . . . that the publication by former special prosecutors of accounts and comments regarding this case and the appellants, while this appeal was pend-

ing, was improper." And in the *Estes* case, the United States Supreme Court struck down Estes' conviction for swindling because the procedure employed by the state in broadcasting and televising the proceedings during the trial involved the probability that prejudice to the accused would result. Moreover, the court held that that procedure will be deemed lacking in due process whether or not isolatable prejudice can be demonstrated. The only case which has come to our attention where a trial judge actually committed himself to the publication of a book regarding a trial over which he presided while the case was on appeal was in the Jack Ruby case. It was argued by defense counsel that the book which the judge proposed to publish gave Judge Joe Brown a personal and pecuniary interest in the impending proceedings. "It is strange enough for a judge to make public announcements about a case he has tried, but to do so in book form while the case is on appeal is unprecedented." Kaplan & Waltz, The Trial of Jack Ruby, p. 360.

There is nothing in the record before us to indicate, nor has any claim been made, that the trial judge had a personal or pecuniary interest in the impending proceedings. While the judge might well have held his social, provocative declamation against "sinning parents" for another day, it is difficult to see, in the present posture of the case, that any right of the defendant has been infringed, denied or violated as a consequence of this incident.

PRUYN, J., and KINMONTH, J., concur with the views expressed herein.