**In re Ruby LAZARUS.**
**Misc. No. 1598(a).**

United States District Court
Central District California.
Aug. 30, 1967.

See also, D.C., 276 F.Supp. 450.

John K. Van de Kamp, United States Atty., Richard M. Coleman, Asst. United States Atty. and Chief of the Special Prosecutions Div., Los Angeles, Cal., for the United States.

Thomas F. Call, Los Angeles, for Ruby Lazarus.

## ORDERS GRANTING IMMUNITY, COMPELLING TESTIMONY BEFORE GRAND JURY, FINDING CIVIL CONTEMPT FOR NON-COMPLIANCE, AND COMMITTING TO CUSTODY

HAUK, District Judge.

This proceeding is a companion case to In re Loughran and Kikumura, Misc. No. 1598–AAH.[1] It arises out of the same investigation of alleged violations of the Federal Statutes prohibiting the Interstate Transmission of Wagering Information;[2] Interstate Interference with Commerce by Threats or Violence (Racketeering and Extortion);[3] Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises;[4] Interstate Transportation of Wagering Paraphernalia;[5] Attempt to Evade or Defeat Occupational Tax (Wagering);[6] Violations of the Federal Communications Act;[7] and other violations of the laws of the United States, conducted by the Central District Grand Jury impaneled September 22, 1966, Philip T. Wilson, Foreman.[8]

1. 276 F.Supp. 393 (C.D.Cal., 1966–67).

2. 18 United States Code § 1084.

3. 18 United States Code § 1951.

4. 18 United States Code § 1952.

5. 18 United States Code § 1953.

6. 26 United States Code §§ 4411, 4412, 7201.

7. 47 United States Code §§ 203, 501.

8. Originally impanelled on September 22, 1966, this "Wilson" Grand Jury was due to wind up its work and be discharged at the end of the court session, the first Monday in March (the 7th) 1967. Local Rule 16, U.S.D.C., C.D.Cal. However, its term was extended by the March 3, 1967 Order of Chief Judge Thurmond Clarke until May 8, 1967; and again by his May 3, 1967 Order its term was extended to March 21, 1968, for the full eighteen

Now, a little more than two months after the proceedings against Miss Loughran and Miss Kikumura, the Grand Jury is still probing the "Little Apalachin" meeting of big name gamblers and underworld figures held in October 1965 at the Palm Springs-residence of these two Las Vegas showgirls.[9]

More specifically, witness Ruby Lazarus, a Miami Beach and New York City bookmaker, was interrogated extensively about Vincent (Jimmy Blue Eyes) Alo and Anthony (Fat Tony) Salerno, New York members of the Cosa Nostra "Family" headed by Vito Genovese, as well as Jerome (Jerry) Zarowitz, credit manager of Caesars Palace on the Las Vegas "Strip" and Elliott Paul Price, a host at the same club, all reported by the press to have been in attendance.[10]

### INITIAL COURT HEARING: ORDER CONFIRMING IMMUNITY AND COMPELLING TESTIMONY.

In response to subpoena, Ruby Lazarus appeared before the Grand Jury on March 9, 1967, but refused to answer any questions, invoking his privilege against self-incrimination under the Fifth Amendment of the Federal Constitution.

Thereupon, the United States Attorney came before this Court with the Grand Jury and the witness Lazarus and filed the following "APPLICATION FOR IMMUNITY":[11]

"The United States of America moves this Honorable Court for an order instructing Ruby Lazarus to testify and produce evidence pursuant to the provisions of Title 47, United States Code, Section 409(1), and respectfully alleges as follows:

"1. On December 13, 1966, a duly constituted grand jury began an inquiry into alleged violations of the Federal statutes prohibiting the Interstate Transmission of Wagering Information, Title 18, United States Code, Section 1084; Interstate Transportation in Aid of Racketeering, Title 18, United States Code, Section 1952; Interstate Transmission of Wagering Paraphernalia, Title 18, United States Code, Section 1953; Attempt to Evade Occupational Tax (Wagering), Title 26, United States Code, Sections 4411, 4412, 7201; and violations of the Federal Communications Act, Title 47, United States Code, Sections 203 and 501, and other violations of the laws of the United States.

"2. Ruby Lazarus was subpoenaed to appear and did appear before the grand jury on March 9, 1967.

"3. In response to numerous questions related to activities falling within the scope of the above statutes, respondent invoked the Constitutional privilege against self-incrimination and refused to answer.

"4. This application for immunity is being made in good faith, with the

---

months provided in Rule 6(g), Federal Rules of Criminal Procedure.

**9.** This Palm Springs meeting is not to be confused with the "Big Apalachin" convocation of notorious crime syndicate figures in Apalachin, New York on November 14, 1957, which resulted in criminal convictions of several participants for conspiracy to commit perjury and obstruct justice by giving false and evasive testimony. United States v. Bonanno, 177 F.Supp. 106 (S.D.N.Y., 1959); 178 F.Supp. 62 (S.D.N.Y., 1959).

Although these convictions were later reversed on appeal, United States v. Bufalino, 285 F.2d 408 (C.A.2d, 1960), nevertheless the scope and relationship of the

various national leaders in the Cosa Nostra "Family", the modern Mafia crime syndicate, were disclosed to the public.

**10.** Los Angeles Times, December 18, 21, 25, 1966; Los Angeles Herald-Examiner, December 18, 21, 22, 1966; Riverside Daily Enterprise, December 21, 24, 1966.

**11.** As indicated in In re Loughran and Kikumura, Misc. No. 1598, 276 F.Supp. 393 (C.D.Cal., 1966–67), this application might better be termed "APPLICATION FOR CONFIRMATION OF IMMUNITY AND COMPULSORY TESTIMONY OF WITNESS BEFORE GRAND JURY."

approval of the Attorney General, in the belief that the witness can give important testimony which will be pertinent to the grand jury inquiry.

"WHEREFORE, the United States of America requests the Court to ORDER Ruby Lazarus to answer the questions which he has heretofore refused to answer, and to testify and produce evidence relating to all matters pertinent to the pending grand jury inquiry, pursuant to the provisions of Title 47, United States Code, Section 409(1)." [12]

Upon motion of the United States Attorney and pursuant to provisions of Rule 6(e) Federal Rules of Criminal Procedure,[13] the Court directed the Grand Jury's certified shorthand reporter to take the stand and disclose the interrogation of the witness Lazarus in the transcript:[14]

" 'BY MR. COLEMAN:

" 'Q   Would you please state your full name, sir?

" 'A   Ruby Lazarus.'

"MR. COLEMAN: Excuse me, was the witness sworn?

"A   Yes, he was.  He spells his name, L-a-z-a-r-u-s.

"Q   Would you speak a little louder?

"A   He respelled his name L-a-z-a-r-u-s.  (Whereupon witness reads as follows:)

" 'Q   And your address, sir?

" 'A   47—214 First Street, Long Island, New York City.

" 'Q   Are you the same Ruby Lazarus who appeared before this Grand Jury late in 1966, in December?

" 'A   I am.

" 'Q   Did you appear here that day, Mr. Lazarus, as a result of the subpoena?

" 'A   I did.

" 'Q   At that time, Mr. Lazarus, there was an arrangement made, was there not, to call you under subpoena so that you would return and appear before this

12. "47 United States Code
§ 409(*l*)   *Self-incrimination*
No person shall be excused from attending and testifying or from producing books, papers, schedules of charges, contracts, agreements, and documents before the Commission, or in obedience to the subpena of the Commission, whether such subpena be signed or issued by one or more commissioners, or in any cause or proceeding, criminal or otherwise, based upon or growing out of any alleged violation of this chapter, or of any amendments thereto, on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him may tend to incriminate him or subject him to a penalty or forfeiture; but no individual shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, documentary or otherwise, except that any individual so testifying shall not be exempt from prosecution and punishment for perjury committed in so testifying."

13. "Federal Rules of Criminal Procedure, Rule 6(e)
*Secrecy of Proceedings and Disclosure.* Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties.  Otherwise a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.  No obligation of secrecy may be imposed upon any person except in accordance with this rule. The court may direct that an indictment shall be kept secret until the defendant is in custody or has given bail, and in that event the clerk shall seal the indictment and no person shall disclose the finding of the indictment except when necessary for the issuance and execution of a warrant or summons."

14.  Rep.Tr., March 9, 1967, p. 13, line 14 to p. 25, line 18.

Grand Jury upon at least two day's notification?

" 'A   That is why I am here today.

" 'Q   Sir, that notification was to be given you through your counsel at that time, a Mr. Rosen of Miami; was it not?

" 'A   That is right.

" 'Q   Sir, that notification was in fact given to you last week through Mr. Rosen for your appearance here toaay; was it not?

" 'A   Yes, that is right.'

"THE COURT: What was that date again?

"THE WITNESS: Last week through Mr. Rosen. (Whereupon witness continues reading:)

" 'A   Yes, that is right.

" 'Q   Are you represented today here in Los Angeles by counsel?

" 'A   No, I am not.

" 'Q   Mr. Lazarus, let me put on the record of this Grand Jury what we have discussed outside this Grand Jury.   I informed you, sir, that last week I spoke with Mr. Rosen on the telephone concerning your appearance before this Grand Jury today.   At that time Mr. Rosen asked if it would be possible to postpone your appearance before this Grand Jury for a period of at least two to three weeks due to the fact that Mr. Rosen had a commitment in the trial of a case in Miami, Florida.

" 'I explained to Mr. Rosen that while it was the policy of this Grand Jury to accommodate attorneys or witnesses when it was possible, that in this instance it would not be possible due to the schedule of the Grand Jury.   That the Grand Jury was already in process, and due to the fact that this Grand Jury just recently received an extension from the court of its time to consider cases for an additional 60 days, approximately.

" 'When I explained that to Mr. Rosen, it was my understanding that arrangements would be made that you would obtain local counsel here.   Mr. Rosen was also informed that it was a reasonable assumption that the question of application for immunity as a witness for yourself might be involved in your appearance this week.

" 'You and I have discussed what I have just related prior to your appearance in this room;   have we not, sir?

" 'A   I understand that Mr. Rosen called you and spoke about a postponement.   What the topic of your conversation was, I do not—

" 'Q   Pardon me?

" 'A   I say other than that, I do not know.

" 'Q   Mr. Lazarus, have your made arrangements to obtain local counsel?

" 'A   No, I have not.

" 'Q   Mr. Lazarus, I wish to inform you that the purpose of this Grand Jury is to investigate possible violation of the laws of the United States.   Among the laws that possibly have been violated that this Grand Jury is investigating are Sections 1084, 1952, 1953 of Title 18 of the United States Code, Section 1084 relates to the transmission of wagering by phone or telegraph.   Section 1952 makes it a crime to use the telephone as an aid of racketeering.   Among other laws with which the Grand Jury is concerned are Sections 203 and 501 of Title 47, United States Code, which deals with violations of the Federal Communications Act.

" 'Do you understand what I have said to you up to this point?

" 'A   Yes, I do.

" 'Q   Mr. Lazarus, you have been called as a witness.   This Grand Jury believes you have information that can help this Grand Jury in its investigation.   Do you understand, sir, your right under the Fifth Amendment of the Constitution which gives you the right not to answer any question, the truthful answer of which might tend to incriminate you personally of a crime?   Do you understand your rights, sir?

" 'A   I do.

" 'Q   Under the Fifth Amendment?

" 'A   I do.

" 'Q  I wish to inform you also that one of the statutes with which this Grand Jury is concerned as was mentioned earlier is the Federal Communications Act.  That Act has provisions whereby if you assert the Fifth Amendment rather than answering questions, this Grand Jury might seek the help of the court to order you to answer questions.  That order of the court, Mr. Lazarus, would in effect operate to grant you immunity by which—I mean that you cannot be prosecuted for anything about which you answer in response to questions propounded before this Grand Jury.

" 'Do you understand that, sir?

" 'A  Yes, I do.

" 'Q  Do you understand also, sir, that should this immunity be conferred upon you, it would not extend to perjury. That is when you answer after having been ordered by the court, you must answer truthfully or be subject to the penalties for perjury.

" 'Do you understand that, sir?

" 'A  Yes, I do.

" 'Q  Finally, I should inform you, sir, that if you do assert the Fifth Amendment privilege rather than answer any questions propounded to you, it is the intention of the Grand Jury to seek the assistance of the court to order you to answer.

" 'Do you understand, sir?

" 'A  Yes, I do.

" 'Q  Mr. Lazarus, do you know Vincent Alo?

" 'A  I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q  Do you know Tony Salerno?

" 'A  I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q  Do you know Elliot Paul Price?

" 'A  I decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q  Do you know Jerry Zarowitz?

" 'A  I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q  Why did you and Salerno leave Miami, Florida in October, 1965?

" 'A  I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q  Did you and Salerno travel to Palm Springs, California in October, 1965?

" 'A  I respectfully decline to answer on the grounds that it might tend to incriminate me.

" 'Q  Did you and Tony Salerno share a room at the Canyon Club in Palm Springs, California?

" 'A  I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q  In October, 1965, were you present at the meetings at 893 Camino del Sur, Palm Springs, California, with Alo, Salerno, Price and Zarowitz?

" 'A  I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q  Were the telephones at 893 Camino del Sur, Palm Springs, California used to transact gambling business and to place wagers?

" 'A  I respectfully refuse to answer on the grounds that it might tend to incriminate me.

" 'Q  Did you yourself use the phones there to lay off wagers?

" 'A  I respectfully refuse to answer that question on the grounds that it might tend to incriminate me.

" 'Q  Did Tony Salerno use the phones there to conduct gambling business?

" 'A  I respectfully refuse to answer that question on the grounds that it might tend to incriminate me.

" 'Q  Did Zarowitz use the phones there to call Las Vegas to transmit wagering information?

" 'A  I respectfully refuse to answer on the grounds that it might tend to incriminate me.

" 'Q Did Price use the phones there to call Massachusetts to conduct gambling operations?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q Did Vincent Alo use the phones there in connection with the gambling and other activities of the criminal syndicate known as La Cosa Nostra, or the Mafia?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q What was the purpose of the meeting on October, 1965 at Palm Springs, California?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q Was there a discussion at that meeting concerning the division of points in the ownership of Caesars Palace in Las Vegas, Nevada?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q Was there a discussion at that meeting concerning the conduct of a gambling layoff operation in the Eastern United States?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q Was there a discussion at that meeting between you and Zarowitz?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.'

"MR. COLEMAN: Excuse me. In that question, is it was there a discussion, or was there a dispute?

"THE WITNESS: I am sorry, it is was there a dispute.

"THE COURT: Read it again.

(Whereupon witness continues reading:)

" 'Q Was there a dispute at that meeting between you and Zarowitz?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q Was there a dispute at that meeting between you and Elliot Paul Price?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q What was the subject matter of the dispute?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q In October, 1965, for what purpose was a telephone call placed from Palm Springs, California to Robert Lynn Martin in Las Vegas, Nevada?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q In October, 1965, for what purpose was a telephone call placed from Palm Springs, California to the Prokos Brothers in Miami, Florida?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q In October, 1965, for what purpose was a telephone call placed from Palm Springs, California to Basil Milardi and Charles Cardinali, in Union City, New Jersey?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q In October, 1965, for what purpose was the call placed from Palm Springs, California to Herbert Kaufman in Baltimore, Maryland?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q In October, 1965, for what purpose was a telephone call placed from Palm Springs, California to Harry Chorodowsky, also known as Harry Clayton in Brighton, Massachusetts?

" 'A I respectfully decline to answer that question on the grounds that it might tend to incriminate me.

" 'Q At this point, Mr. Lazarus, I will ask the foreman of the Grand Jury to excuse you with the direction that you remain nearby, as it is this Grand Jury's intention to seek the aid of the court in this matter. Mr. Foreman?

" 'THE FOREMAN: So ordered.'

"BY MR. COLEMAN:

"Q Does that conclude the testimony of Ruby Lazarus before the Grand Jury here in the United States Court House on March 9, 1967?

"A Yes, it does.

"MR. COLEMAN: Thank you, Miss Caporizzo. May the witness be excused?

"THE COURT: All right, you may step down."

At the completion of the reading of the Grand Jury testimony, the Court then inquired whether anything was to be presented on behalf of the witness Lazarus, and the following colloquy occurred:[15]

"THE COURT: All right, is anything to be presented on behalf of Mr. Lazarus? Mr. Lazarus, you are warned, of course, beforehand, that anything you may say may be used against you. You do not have to answer any questions. You don't have to take the stand, or anything else. We are not compelling you to do it at this time. But I am going to give you every opportunity to do it directly, and I think with a reasonable availability of counsel, which he had, to make any representation he desires.

"MR. LAZARUS: The only thing I can say, your Honor, is my attorney asked for a postponement for this case, because he was very busy with one which is now pending in Miami. I would like to ask the same thing in his absence.

"THE COURT: Yes. Well, I think you had plenty of time to get an attorney. Mr. Rosen isn't the only attorney on the beach. And you know that, I am sure, as well as anybody else, Mr. Lazarus. You are a pretty sophisticated man. You are from Miami. And judging by your associates, you are pretty sophisticated.

"You don't know anybody else? Do you want the Court to appoint a lawyer for you?

"MR. LAZARUS: I don't know anybody in Los Angeles. I haven't had sufficient time enough to bring one with me.

"THE COURT: You could have called the Bar Association. Mr. Rosen could have supplied you with a lawyer. You are aware of that; aren't you?

"MR. LAZARUS: He spoke with Mr. Coleman this afternoon.

"THE COURT: No, with your own lawyer, not a United States Attorney. What is your excuse for not having a lawyer here today with you?

"MR. LAZARUS: That I wasn't notified to get a local lawyer, your Honor, from Los Angeles. That's in contradiction to Mr. Coleman's testimony.

"THE COURT: You mean your attorney never discussed getting a lawyer here?

"MR. LAZARUS: None other than himself.

"THE COURT: He just told you to come here, a little babe in the woods, to come into this terrible court without a lawyer? Did Mr. Rosen advise you to come here and appear without a lawyer?

"MR LAZARUS: That's right, your Honor.

"THE COURT: So on your attorney's advice, you are appearing here, without a lawyer; is that right?

"MR. LAZARUS: That's the reason I am here today.

"THE COURT: That's good enough for me. If your lawyer Mr. Rosen thinks you are able enough to handle your own case, and you also think so, we will proceed.

15. Rep.Tr., March 9, 1967, p. 25, line 23 to p. 28, line 8.

"MR. LAZARUS: I will not handle my own—not that I will not, I am trying to avoid it, your Honor.

"THE COURT: You mean you don't have to hire a lawyer? You haven't got enough money to hire a lawyer?

"MR. LAZARUS: I didn't say that I didn't have enough money, your Honor. I would like to get a little time.

"THE COURT: Well, we will give you a little time, until tomorrow morning. But at the present moment, I am going to sign the order here. * * *"

▇ In this state of the record, it is clear that here in the present case of the recalcitrant gambler, Lazarus, as was true in the earlier companion case of the two reluctant showgirls, (In re Loughran and Kirkumura, Misc. No. 1598–AAH, —— F.Supp. —— (C.D.Cal., 1966–67), the Court has the duty to invoke its civil contempt power, exercisable in two stages: *First,* recognizing and confirming the immunity automatically granted to the witness under the Federal Communications Act, 47 United States Code § 409(1), by compelling him to answer the Grand Jury questions. *Secondly,* in the event of refusal, holding the witness in civil contempt and committing him to custody until he does answer the questions. Shillitani v. United States, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); In re Grand Jury Investigation of Giancana, 352 F.2d 921 (C.A. 7th, 1965) cert. den. 382 U.S. 959, 86 S.Ct. 437, 15 L.Ed.2d 362 (1965); United States v. Coplon, 339 F.2d 192 (C.A. 6th, 1964).

Taking the first step in the civil contempt against the witness Lazarus the Court formally ordered him to appear again forthwith before the Grand Jury and answer its questions:

"ORDER.

"The United States of America having on this date made written and oral application for an order compelling Ruby Lazarus to testify and produce evidence before a duly constituted Grand Jury of the Central District of California, pursuant to Title 47, United States Code, Section 409(1); and

"The said Ruby Lazarus, on March 9, 1967, having declined to answer questions before the said Grand Jury on the ground that his answers might tend to incriminate him, the aforesaid Grand Jury then and there inquiring, *inter alia,* into possible violations of Title 47, United States Code, Sections 203, 501 and of Title 18, United States Code, Section 1084; it is

"ORDERED, that the said Ruby Lazarus appear forthwith before said Grand Jury and that he be and hereby is ordered and compelled to testify and produce evidence with respect to the matters under inquiry before the said Grand Jury, including the questions which he refused and declined to answer as shown in the Grand Jury transcript just read into the record before me.

S/ A. ANDREW HAUK
_____
A. ANDREW HAUK
United States District Judge"

The Court supplemented the foregoing order with the following oral comments in open court:[16]

"All right, I am signing this order. Now, Mr. Lazarus, you are ordered to report immediately back up to the Grand Jury room as you can see, and to answer these questions. As I am sure your counsel has explained to you when he first discussed with you the use of the Fifth Amendment and invoking your privilege against self-incrimination, I inform you that the pertinent provisions of the immunity section of the Federal Communications Act which I read before apply in your situation here; namely, Title 47, United States Code, Section 409 (1). You are not excused from attending and testifying, and I am ordering you to attend and testify before the Grand Jury. You are not excused on the grounds that it may tend to incriminate you or subject you to a penalty or for-

16. Rep.Tr., March 9, 1967, p. 29, line 14 to p. 33, line 5.

feiture. But you shall not be prosecuted or subjected to any penalty or forfeiture for and on account of any transaction, matter or thing concerning which I am compelling you, after your having claimed your privilege against self-incrimination, to testify or produce evidence, documentary or otherwise. Except, of course, you will not be exempt from any prosecution for perjury committed while so testifying.

"Now, you will recall, I am certain, having had some mild association with the parties, that the two ladies, Natalie Loughran and the other lady—

"MR. COLEMAN: Carolyn Kikumura.

"THE COURT: They were before this court, oh, I think it was just before Christmas, and I made the order that they testify. There seemed to be a lot of worry at that time that something might happen to them. I understand they are still healthy, vigorous, charming young ladies. Nothing has ever happened to them from the Cosa Nostra or the Mafia, or the rest of the syndicates so-called, or any of them. I don't know what your feeling about it is, but I have a strong feeling also in your case that you can testify without worry from the mob, so-called.

"In any event, you are ordered to testify. I might suggest that you go back and testify, and testify truthfully. However, the court is still available in case you don't. I might indicate this: That in case you persist in your refusal, I won't hesitate a minute to invoke the sanctions available to the court by way of either civil or criminal contempt, whichever is available to the court, to enforce the order to the best of my ability.

"I guess you know enough about some of the other cases, the *Giancana* case in Chicago, and the *Harris* case in New York, and the others which I am sure you are somewhat familiar with. You know what happened there, and that imprisonment, at least to the extent of the life of the Grand Jury, is one of the penalties which I can enforce. You understand that?

"MR. LAZARUS: I do, your Honor.

"THE COURT: All right.

"MR. LAZARUS: But, your Honor, can I have a little bit of an adjournment to try and get myself a local attorney?

"THE COURT: Well, I think we will order you back up there to testify, and then—well, I don't know. I will leave it to the U. S. Attorney. If the jury is ready to go now, you can testify. If the U. S. Attorney wants to let you come back in the morning after talking to your lawyer, why I will leave it to him. We can't hold up the Grand Jury proceedings.

"MR. COLEMAN: Thank you, your Honor.

"THE COURT: We will see what Mr. Lazarus does. At any rate, the court is here, and I suggest strongly in any event, no matter what happens this afternoon, whether you answer or not, Mr. Lazarus, and whether Mr. Coleman allows you to come back tomorrow for further testimony or not, that you see a lawyer tonight. Because if you come in tomorrow, and you come before this court again without a lawyer, I am either going to appoint one to represent you, or you will have to just handle it yourself.

"If you say you are indigent and can't afford an attorney, I will appoint one. If you have the money, and I gather you do from what you have said, then you'd better be here with your lawyer, or be prepared to be your own lawyer. Because we won't hesitate.

"I think Mr. Rosen, your lawyer in Florida, is sophisticated enough, and so are you. You are certainly as sophisticated as I. If I were a person before a court, whether it be in New York or Miami, I would call my lawyer back in Los Angeles and say, 'Whom do you recommend;' and I would have that lawyer with me.

"All right.

"MR. COLEMAN: Your Honor, may we have the Grand Jury ordered back to the Grand Jury room, and the witness also, where we may discuss the question

of whether we will proceed now or to-morrow morning?

"THE COURT: All right, so ordered. The Grand Jury will return, and Mr. Lazarus will also return to the Grand Jury room."

Thereupon the Court adjourned.

## SECOND HEARING: ORDER FINDING WITNESS LAZARUS IN CONTEMPT OF COURT AND COMMITTING HIM TO CUSTODY OF ATTORNEY GENERAL UNTIL COMPLIANCE WITH ORDER TO ANSWER QUESTIONS OF GRAND JURY.

The next day, March 10, 1967, the United States Attorney again appeared in court with the Grand Jury and with the witness Lazarus, who this time was accompanied by his retained counsel, Thomas F. Call. Upon motion of the United States Attorney and again pursuant to the authority of Federal Rules of Criminal Procedure, rule 6(e), the Court directed the Grand Jury's certified shorthand reporter to take the witness stand and make public the transcript of the record of the new interrogation of the witness Lazarus that morning:[17]

" 'Q Would you please, once again, state your full name?

" 'A Ruby Lazarus.

" 'Q Mr. Lazarus, you are the same Ruby Lazarus who has appeared before this Grand Jury yesterday and also appeared in the court of Judge A. Andrew Hauk yesterday, are you not?

" 'A Yes, i am.

" 'Q If I might review what transpired yesterday afternoon, Mr. Lazarus. As you remember, we proceeded to the court and to the court's aid for an order to compel testimony. The Court made such an order. That order, Mr. Lazarus, because of the provisions of the Federal Communications Act, operates to give you full protection in your testimony. That is to say, that you can't be prosecuted for anything about which you testified truthfully in response to questions directed to you before this Grand Jury. Do you understand that, sir?

" 'A Yes, I do.

" 'Q This is what is called immunity from prosecution. This immunity, however, sir, does not extend to untruthful answers. That is to say, if you should lie in response to questions put to you before this Grand Jury you would still be subject to the penalties for perjury. Do you understand that, Mr. Lazarus?

" 'A Yes, I do.

" 'Q Yesterday afternoon, Mr. Lazarus, after leaving court you returned to this Grand Jury room and the questions were put to you again, and you declined to answer at that time, did you not, sir?

" 'A That is right.

" 'Q You understand, sir, that by virtue of Judge Hauk's order and by the operation of the Federal Communications Act there is no longer available to you the Fifth Amendment protection. That protection exists in order that you would not be prosecuted for a crime, evidence of which is to be secured from your own testimony. But now that you have been ordered to testify, if you answer truthfully you cannot be prosecuted. The reason for the Fifth Amendment is to prevent you from being prosecuted. Now, since you cannot be prosecuted for your truthful answers, the reason for the Fifth Amendment disappears and it is no longer available to you. Do you understand that, sir?

" 'A Yes, I do.

" 'Q At the conclusion of the questioning yesterday afternoon at approxi-

17. Rep.Tr., March 10, 1967, p. 40, line 7 through p. 48, line 13.

mately 4:00 P.M. it was the decision of this Grand Jury, Mr. Lazarus, to allow you until 11:00 o'clock this morning to reconsider your position and to have an opportunity to consult with an attorney. And you were given an opportunity, were you not, Mr. Lazarus?

" 'A Yes, I was.

" 'Q Did you avail yourself of the time by contacting an attorney?'

" 'A I did.

" 'Q Are you represented now by an attorney locally?

" 'A I am.

" 'Q What is that attorney's name, sir?

" 'A Mr. Thomas Call.

" 'Q Mr. Call is in attendance outside this Grand Jury room at this time, is he not, sir?

" 'A Yes, he is.

" 'Q I wish to tell you, Mr. Lazarus, that at any time during this questioning should you desire to consult with your attorney you have only to ask the foreman's permission and I am sure he will allow you the opportunity to step outside the room to consult with your attorney. Do you understand that, sir?

" 'A Yes, I do.

" 'Q Finally, Mr. Lazarus, as Judge Hauk indicated, having been ordered by the court to testify, should you persist in your refusal the court has available to it certain sanctions to compel you to comply with its order. One of these sanctions is incarceration. Do you understand that, sir?

" 'A Yes, I do.

" 'Q It was the Grand Jury's decision yesterday to allow you this additional time to consult with an attorney and to think over the alternatives before you and to give you an opportunity to reconsider the choice you made yesterday afternoon. With that in mind it is this Grand Jury's wish to put again to you questions which it posed to you yesterday, in the hope that you might, after this reflection and consultation, choose to answer them this morning. Mr. Lazarus, do you know Vincent Alo?

" 'A I decline to answer that question.

" 'Q For what reason do you decline to answer that question, Mr. Lazarus?

" 'A I decline to answer that question.

" 'Q Do you know Tony Salerno?

" 'A I decline to answer that question.

" 'Q Do you know Elliot Paul Price?

" 'A I decline to answer that question.

" 'Q Do you know Jerry Zarowitz?

" 'A I decline to answer that question.

" 'Q Why did you and Salerno leave Miami, Florida in October 1965?

" 'A I decline to answer that question.

" 'Q Why did you and Salerno travel to Palm Springs, California in October 1965?

" 'A I decline to answer that question.

" 'Q Did you and Tony Salerno share a room at the Canyon Club Inn in Palm Springs, California?

" 'A I decline to answer that question.

" 'Q In October 1965 you were present at meetings at 893 Camino del Sur, Palm Springs, California, with Alo, Salerno, Price and Zarowitz?

" 'A I decline to answer that question.' "I am sorry. That question was: " 'In October 1965 were you present at meetings at 893 Camino del Sur, Palm Springs, California, with Alo, Salerno, Price and Zarowitz?

" 'A I decline to answer that question.

" 'Q Were telephones at 893 Camino del Sur, Palm Springs, California, used to transact gambling business and to place wagers?

" 'A I decline to answer that question.

" 'Q Did you use the phones there to lay off wagers?

" 'A I decline to answer that question.

" 'Q Did Tony Salerno use the phones there to conduct gambling business?

" 'A I decline to answer that question.

" 'Q Did Zarowitz use the phones there to call Las Vegas to transmit wagering information?

" 'A I decline to answer that question.

" 'Q Did Price use the phones there to call Massachusetts to conduct gambling operations?

" 'A I decline to answer that question.

" 'Q Did Alo use the phone in connection with the gambling or other activities of the criminal syndicate known as La Cosa Nostra or the Mafia?

" 'A I decline to answer that question.

" 'Q What was the purpose of the meeting in October 1965 at Palm Springs, California?

" 'A I decline to answer that question.

" 'Q Was there discussion at that meeting concerning the division of points in the ownership of Caesars Palace in Las Vegas, Nevada?

" 'A I decline to answer that question.

" 'Q Was there any discussion at that meeting concerning the conduct of a gambling layoff operation in the Eastern United States?

" 'A I decline to answer that question.

" 'Q Was there a dispute at that meeting between you and Zarowitz?

" 'A I decline to answer that question.

" 'Q Was there a dispute at that meeting between you and Price?

" 'A I decline to answer that question.

" 'Q What was the subject matter of the disputes?

" 'A I decline to answer that question.

" 'Q In October 1965 for what purpose was a telephone call placed from Palm Springs, California to Robert Lynn Martin in Las Vegas, Nevada?

" 'A I decline to answer that question.

" 'Q In October 1965 for what purpose was a telephone call placed from Palm Springs, California to the Prokos Brothers in Miami, Florida?

" 'A I decline to answer that question.

" 'Q In October 1965 for what purpose was a telephone call placed from Palm Springs, California to Basil Milardi and Charles Cardinali in Union City, New Jersey?

" 'A I decline to answer that question.

" 'Q In October 1965 for what purpose was a telephone call placed from Palm Springs, California to Herbert Kaufman in Baltimore, Maryland?

" 'A I decline to answer that question.

" 'Q In October 1965 for what purpose was a telephone call placed from Palm Springs, California to Harry Chorodowsky, also known as Harry Clayton, in Brighton, Massachusetts?

" 'A I decline to answer that question.

" 'Q Mr. Lazarus, your persistence in declining to answer these questions leaves this Grand Jury with no choice but to return once more to the court to seek the assistance of the court in this matter.

" 'I would ask that the foreman direct Mr. Lazarus that he is excused but is to remain nearby to await further court proceedings.

" 'THE FOREMAN: You are so ordered.' "

When, in answer to the Court's query, the attorney for the witness Lazarus stated he did not desire to conduct any cross-examination of the Grand Jury's certified shorthand reporter, but only requested a continuance for a week, the Court proceeded to direct the witness Lazarus to answer the questions of the Grand Jury in the following colloquy:[18]

"THE COURT: Yes.

"Of course at this moment this constitutes a hearing that I indicated yesterday would again be afforded Mr. Lazarus when and if he should refuse to obey the order that the court made yesterday.

18. Rep.Tr., March 10, 1967, p. 50, line 14 through p. 52, line 11.

"It seems to me the cases and the statutes, (the law, in other words, that has to be followed by this court) are clear. There are certain guidelines that have been laid down by virtue of the immunity statutes, particularly this immunity statute, Title 47, U.S. Code, Section 409(1), and by the Supreme Court of the United States and inferior or subsidiary Appellate Courts of the United States, which are both superior to this court, and which this court must follow; and that these guidelines are not only clear, but I think compulsive in the present situation. The defendant is fully protected by these guidelines.

"I think he has had the full protection of the law. He has had all the opportunities that the statutory law and the case law provide, and I really see no need for delay. He has had plenty of opportunity to consult with counsel, and he has taken a contumacious, contemptuous attitude to the Grand Jury and the Court, despite the order of the court yesterday in connection with the application for immunity.

"The law is clear that anything at all that he testifies to before this Grand Jury cannot be used in any way to prosecute him or put him in jeopardy in any way whatsoever for violation of any criminal law, statute, decision, or in any other way to affect him criminally. He has complete and total immunity under the law for any testimony given in answer to any questions posed by this Grand Jury or Government counsel in the hearings of this Grand Jury, including the questions he refused to answer this morning, and I think they are virtually identical to the questions that were asked him yesterday, which he refused to answer.

"Once again, Mr. Lazarus, in the presence of your counsel and in the presence of the Grand Jury and the Government attorney in this hearing, I direct and order you to answer all of the questions of this Grand Jury, and particularly and specifically the questions that were asked you this morning and yesterday, that is, the questions which were read by the Witness Caporizzo, the young lady reporter here this morning at this hearing. And I ask you what is your response, will you or will you not answer these questions?

"MR. LAZARUS: At this time I decline to answer, your Honor."

Now that the witness Lazarus has persisted in his refusal to answer the questions of the Grand Jury in contumacious disobedience of the Court's orders, the Court has no alternative but to hold him in civil contempt and commit him to custody until he shall comply with the orders and answer the questions.

█ His immunity is as extensive as his answers. It is not limited to proceedings or questions based upon or growing out of the Federal Communications Act, and it extends to both Federal and State prosecutions. Marcus v. United States, infra, 310 F.2d at pages 146–167; In re Grand Jury Investigation of Giancana, supra, 352 F.2d at 924–925; United States v. Coplon, supra, 339 F.2d at 193; Murphy v. Water Front Commission, 378 U.S. 52, 54, 79–80, 84 S.Ct. 1594, 1596, 1610, 12 L.Ed.2d 678, 681, 695–696 (1964).

█ It is elementary that a Grand Jury is an arm of the court and that refusal to comply with an order of court directing a witness to answer proper questions before a Grand Jury is a contempt of court. Marcus v. United States, 310 F.2d 143, 146 (C.A.3d, 1962). The appropriate procedure is summarized in Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622, 627 (1966):

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt. United States v. United Mine Workers, 330 U.S. 258, 330–332 [67 S.Ct. 677, 713–714, 91 L.Ed. 884] (1947) (Black and Douglas, JJ., concurring in part and dissenting

in part); United States v. Barnett, 376 U.S. 681, 753–754, [84 S.Ct. 984, 1019–1020, 12 L.Ed.2d 23] (1964) (Goldberg, J., dissenting). And it is essential that courts be able to compel the appearance and testimony of witnesses. United States v. Bryan, 339 U.S. 323, 331 [70 S.Ct. 724, 730, 94 L.Ed. 884] (1950). A grand jury subpoena must command the same respect. Cf. Levine v. United States, 362 U.S. 610, 617 [80 S.Ct. 1038, 1043, 4 L.Ed.2d 989] (1960). Where contempt consists of a refusal to obey a court order to testify at any stage in judicial proceedings, the witness may be confined until compliance. McCrone v. United States, 307 U.S. 61 [59 S.Ct. 685, 83 L.Ed. 1108] (1939); Giancana v. United States, 352 F.2d 921 (C.A.7th Cir.) cert. denied 382 U.S. 959 [86 S.Ct. 437, 15 L.Ed.2d 362] (1965).[6] The conditional nature of the imprisonment—based entirely upon the contemnor's continued defiance—justifies holding civil contempt proceedings absent the safeguards of indictment and jury. Uphaus v. Wyman, 364 U.S. 388, 403–404 [81 S.Ct. 153, 5 L.Ed.2d 148] (1960) (Douglas, J., dissenting), provided that the usual due process requirements are met.[7]

"n.6 The court may also impose a determinate sentence which includes a purge clause. This type of sentence would benefit an incorrigible witness. It raises none of the problems surrounding a judicial command that unless the witness testifies within a specified time he will be imprisoned for a term of years. See Reina v. United States, 364 U.S. 507 [81 S.Ct. 260, 5 L.Ed.2d 249] (1960).

"n.7 See Parker v. United States, 153 F.2d 66, 70 [163 A.L.R. 379] (C.A. 1st Cir. 1946)."

The Court has been meticulous in giving the witness Lazarus every element of due process. He has had notice of the hearings, the chance to confront and cross-examine all witnesses against him, full opportunity to be heard directly and through counsel. He has been represented by counsel whose consultative advice has been available to him at all times. The Court even went to the extent of continuing the matter overnight so that Lazarus could deliberate with his Florida attorney and arrange for Los Angeles counsel. Throughout this hearing today he has been fully and vigorously protected by local counsel, a thoroughly competent member of the Bar of this Court.

The only problem we now have is the choice of sanctions and that problem was solved for us by the Supreme Court two years ago. The teaching of *Shillitani*[19] is that, following the doctrine of exercising "[t]he least possible power adequate to the end proposed", the Court should imprison the witness for a period not exceeding the duration of the term of the Grand Jury but until his compliance with the orders of the Court by giving answers to the Grand Jury questions.

We strongly admonish the witness Lazarus that the conditional imprisonment imposed upon him is for the obvious purpose of compelling him to obey the order to testify before the Grand Jury. As a result, "he carries the key of his prison in his own pocket." If he had chosen to obey the order he would not have faced jail. And the sentence is not by way of punishment but solely to secure answers to the Grand Jury's questions.[20]

The Lazarus of the Bible[21] had no control over his death and, indeed, none over his return to life. But here this latter day Lazarus is the master of both his judicial death and his legal resurrection. By his own choice he is asking for the mausoleum of the penitentiary to which the Court is about to commit him; yet he holds the key to the door which he

19. Shillitani v. United States, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622, 628 (1966).

20. Shillitani v. United States, supra, 384 U.S. at 368, 86 S.Ct. at 1534, 16 L.Ed. at 626 (1966); In Re Nevitt, 117 F. 448, 461 (C.A. 8th, 1902).

21. New Testament, Gospel according to St. John, Chapter 11, Verses 1–44.

need not but wants to enter. All he has to do is talk. But if he insists on silence, it will be the silence of the penitential tomb for the duration of the term of the Grand Jury.

■ Therefore, in application of the Courts' "inherent power to enforce compliance with their lawful orders through civil contempt" [22] we now make and enter the following:

"ORDER

"Ruby Lazarus having appeared before a duly constituted Grand Jury of the Central District of California sworn in on September 22, 1966, and sitting at Los Angeles, California, on March 9, 1967, and having refused to answer certain questions;

"And the said Ruby Lazarus on March 9, 1967, having been ordered after a hearing on an Application pursuant to § 409(1) Title 47, United States Code had been held, by the Honorable A. Andrew Hauk, United States District Judge for the Central District of California, to answer the aforesaid questions before the above-mentioned Grand Jury;

"And the said Ruby Lazarus on March 10, 1967, having again appeared before the above-mentioned Grand Jury and again having refused to answer the aforesaid questions;

"And the said Ruby Lazarus on March 10, 1967, again having appeared before the Honorable A. Andrew Hauk and a hearing having been held, and the said Ruby Lazarus having been directed to answer the aforesaid questions by the Honorable A. Andrew Hauk;

"And the said Ruby Lazarus having refused to answer said questions, it is

"ORDERED, that the respondent Ruby Lazarus hereby is found to be in contempt of this Court and is hereby committed to the custody of the Attorney General, or his authorized representative until such time as he shall comply with the Order of this Court and answer the questions of the aforesaid Grand Jury.

S/ A. ANDREW HAUK
A. ANDREW HAUK
United States District Judge
March 10, 1967."

Upon motion of counsel for the witness and upon posting a $10,000.00 surety bond, the Court granted a Stay of Execution until March 16, 1967, at 10.00 A.M., to enable Lazarus to put his personal affairs in order.

On this date he surrendered to the United States Marshal in Los Angeles, his bond was exonerated and he was committed to the custody of the Attorney General and incarcerated in the Los Angeles County Jail, where he is still held as of the present moment—August 30, 1967, more than five months later.

No appeal has been taken and no further proceedings have been instituted on behalf of the Government or the witness. It appears therefore, that by his continuing contempt in refusing to answer the questions of the Grand Jury, the witness Lazarus has deliberately decided to "keep the key of his prison in his own pocket" and be incarcerated in self-imposed silence for the duration of the Grand Jury's term, that is, until March 21, 1968.

---

22. Shillitani v. United States, supra, 384 U.S. at 370, 86 S.Ct. at 1535, 16 L.Ed.2d at 627 (1966).